[Crim. No. 3899. Third Dist. June 3, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. GEORGIA L. WELBORN, Defendant and Appellant.

Anthony J. Chargin for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Doris Maier, Assistant Attorney General, and Richard K. Turner, Deputy Attorney General, for Plaintiff and Respondent.

PIERCE, P. J.—Using her husband's rifle, a .22 caliber semiautomatic, defendant shot him four times. One bullet was fatal. She was charged with second degree murder. A jury convicted her of voluntary manslaughter.

Her appeal involves no new or important issue of law, changes no established principle of law. Because the discussion of the principal point raised on appeal does, we think, illustrate an intelligent, painstaking and too infrequently invoked use by the trial judge of his power to make jury instructions more meaningful by fitting them to the specific facts, we deem this opinion meets the standard for publication. (Cal. Rules of Court, rule 976.)

There is no doubt defendant shot and killed her husband. Her defense was that the shooting (at least as regards the fatal bullet) was accidental. One contention on appeal, not the principal one, was that the evidence was insufficient to support the voluntary manslaughter conviction. We therefore relate the facts in some detail.

Defendant and Harry Welborn (called "Jack" by the defendant and hereinafter by us) were married in January 1962. The shooting took place October 18, 1964. The marriage was a stormy one. Jack drank to excess. (The degree of that excess may be gauged by the fact that during the latter days of the marriage he consumed a fifth of whiskey a day.) When drunk he became belligerent, arrogant and on several occasions had physically abused defendant. His tirades were punctuated by acts of destruction and violence, by threats to shoot a deputy sheriff, the defendant and himself, and in the presence of his wife he twice tried to shoot a neighbor. The rifle later used by defendant had been purchased by Jack some years before the marriage. He had, in one of his rages, fired the gun four times inside the home and defendant had hidden the gun fearing he would shoot her as he had threatened to do. During this period, defendant, who was going through the menopause, was in deep distress. She was also afraid of her husband. Other sources of her distress were that other women wrote and telephoned her husband. The sexual relations of the couple were unsatisfactory because of Jack's drinking.

On October 18, 1964, defendant had hidden Jack's gun in

the bathroom behind the ironing board. At 4 a.m. that morning Jack arose, had a drink or two and then awakened defendant. At about 10 a.m. Mr. Owen, a neighbor, visited the home. Defendant and Jack were at the kitchen breakfast table, where he continued drinking whiskey. He stated he wanted to leave for Lockeford. His car keys could not be found and he became angered. Defendant looked for the keys and Jack became angrier because he thought she was hiding them. Mr. Owen, by this time, had left the home. Jack, by then intoxicated, asked defendant to bring him his gun. When she did not produce the gun he told her to "get out of the house." Defendant in her testimony at the trial stated that she then decided to produce the gun and did so, taking it from its hiding place. She started to take it to Jack in the kitchen. As she did so, he arose from a kitchen chair where he was sitting with his back to her and looked around toward her. She was frightened, nervous and tense.

From then on, according to her testimony, things were not too clear. She remembered the "gun going off" and she remembered screaming and saying, "My God, Jack, I've hurt you," and then saying, "I'll get help." She had no recollection of actually pulling the trigger, but she thought that her finger was on the trigger. She stated she had had no intention of shooting her husband. She went out into the yard and called to Mr. Owen, saying, "I've shot Jack." When she summoned Owen she was still holding the gun and was hysterical. Mr. Owen called the sheriff's office and an officer arrived. Defendant told the officer she had meant to scare her husband, not to kill him. She told another officer she had not meant to hurt her husband. She was in a highly emotional state. Before any of her statements were given, she was advised of her right to counsel and to remain silent.

As a result of the shooting Jack received four wounds, one of which was fatal. This wound was just below the eighth rib, or the so-called transverse process thereof: a fragment of the bullet was found in the branches of a major vein near the spinal column. In addition there was a wound at the sacroiliac junction, one in the right arm below the elbow which fractured the ulna, and another in the front portion of the thigh.

A criminologist, Dr. Paul Kirk, produced by the defense, examined the fragment of a bullet taken from the victim's low back and testified that it represented not more than a third of a normal intact bullet: the remaining two-thirds

were never found. Dr. Kirk expressed the opinion that the fatal bullet had struck something else which could have been wood prior to entering the victim's body. His conclusion also was that the fatal shot was accidental.

Prosecution evidence, however, showed that the rifle required a separate trigger pull to fire each cartridge. The pressure necessary to a trigger pull was four pounds.

### *Re The Contention That the Evidence Was Insufficient to Justify a Jury Verdict That Defendant Was Guilty of Voluntary Manslaughter.*

The evidence recited is sufficient to justify the jury reasonably to have believed and found that defendant *was* guilty of having shot at her husband and with an intent to kill him, and to disbelieve her story that she did not know how the gun was fired and that she did not intend to kill her husband. She did shoot and hit him four times with a lethal weapon. The fact that the fatal bullet was one which may have ricocheted could mean either that on this shot her aim was bad or that she had deliberately aimed to miss her husband. The jury could have reasonably concluded the former. Particularly significant in this regard is the pressure necessary to discharge each shot.

Voluntary manslaughter is a crime requiring a specific intent. (*People* v. *Gorshen,* 51 Cal.2d 716, 732-733 [336 P.2d 492].) Such intent is almost invariably an inference to be drawn by the jury from circumcumstantial evidence. (See 1 Witkin, Cal. Crimes (1963) p. 58, and authorities cited.)

The character of a weapon and the consequences of its use are facts relevant to the trier of fact on the issue of intent. (*People* v. *Malki,* 181 Cal.App.2d 118, 122 [5 Cal.Rptr. 207].)

Under the facts related the jury acted reasonably in finding that the shooting was intentional, also that it was within the definition of voluntary manslaughter.

"Manslaughter is the unlawful killing of a human being without malice." (Pen. Code, § 192.) It is voluntary when the killing is "upon a sudden quarrel or heat of passion." (Pen. Code, § 192, subd 1.) We need not reiterate the facts. Described above, they clearly come within the purview of the statutory definition. They were acts "upon a sudden quarrel or heat of passion."

In *People* v. *Borchers,* 50 Cal.2d 321, 329 [325 P.2d 97], the court said: "As defendant argues persuasively, 'passion' need not mean 'rage' or 'anger.' According to dictionary

definition, 'passion' may be any 'Violent, intense, high-wrought, or enthusiastic emotion.' (Webster's New International Dictionary, 2d ed.) ▮ As stated in *People* v. *Logan* (1917) 175 Cal. 45, 49 [164 P. 1121], quoted with approval in *People* v. *Danielly* (1949) 33 Cal.2d 362, 377-378 [202 P.2d 18], and *People* v. *Valentine* (1946) 28 Cal.2d 121, 139 [169 P.2d 1], 'the fundamental inquiry [in determining whether a homicide is voluntary manslaughter] is whether or not the defendant's reason was, at the time of his act, so disturbed or obscured by some passion—not necessarily fear and never, of course, the passion for revenge—to such an extent as would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' '' (See also *People* v. *Beach*, 212 Cal.App.2d 486, 493 [28 Cal.Rptr. 62].)

*Re The Contention That the Court Erred in Giving Its Special Instruction to the Jury.*

The trial court fully instructed the jury, giving standard instructions (*inter alia*) on the presumption of innocence, the burden of proof, the necessity of proof to a moral certainty and beyond reasonable doubt, how intent is manifested, definition and explanations of all elements of all offenses which were properly before the jury. It instructed on all facets of excusable homicide and accidental shooting. It explained proximate cause. All of these instructions were given in the abstract, and "formula" instructions were carefully avoided. That is the point at which a more timorous jurist would have completed his instructions—even though, as most trial judges realize, in a case such as this, a hopelessly confused jury might be left, during its deliberations, to wrestle with the niceties of distinctions between the several verdicts possible. ▮ California Constitution, article VI, section 19, permits the trial judge to comment upon evidence and even express opinions on the credibility of witnesses. Our Supreme Court has encouraged the proper use by trial judges of this provision. (See, e.g., *People* v. *Friend*, 50 Cal.2d 570, 576-577 [327 P.2d 97].)[1] ▮ Law must be applied to facts. Jurors are the judges of the facts. If that statement is to mean anything, trial judges should translate the law as expressed in the texts in the parlance of lawyers into language the laymen who are to apply it will understand. Indeed our jury system cannot

[1]Such use, of course, must be within the limits of *Griffin* v. *California* (April 1965) 380 U.S. 609 [85 S.Ct. 1229, 14 L.Ed.2d 106].

properly serve as an effective means of administering justice without this liaison between judge and jury. One jurist has stated: "It should not be supposed that because his jurisdiction is limited, because so much of his work goes unreported, because he is immersed in the detail of fact, the trial judge is clothed with small responsibility in relating law to justice. It is he who makes the law become a living teacher as he transmits it from the legislature and the appellate court to the citizen [e.g., the juror] who stands before him. It is he who watches the impact of the formal rule, explains its purpose to laymen and seeks to make its application conform to the durable and reasonable expectations of his community. It is he who determines whether the processes of common law growth shall decay or flower with a new vigor." (Judge Wyzanski in *A Trial Judge's Freedom and Responsibility* (1952) 65 Harv. L. Rev. 1281, at p. 1304.)

██ Of course the constitutional provision cited (and Pen. Code, § 1127 supplementing it) requires the judge in exercising the power to comment to do so fairly. He must make it clear that he expresses his own views and that the jury, as the sole and absolute judge of the facts, is not bound by them. The trial judge who presided in this case did *not* attempt to interject his own opinions of the credibility of witnesses even though he had the power to do so. Neither did he intersperse any discussion of the evidence produced with his original instructions as to the law. What he did do was to labor conscientiously to supplement the difficult instructions already given abstractly by connecting them with the facts as a whole to make the law more clear. He prepared and gave a special instruction. In so doing he carefully admonished the jury as required by law. (Cal. Const., art. VI, § 19.) This special instruction commenced with the statement: "You can see that the gradations of homicide are not simple and these abstract instructions that have been given you may be difficult to understand.

"I will undertake to apply these instructions to the specific facts of the present case.

"The evidence is clear that four bullets emerged from a gun held by Georgia Welborn. All of the bullets hit Harry Welborn, and the one that entered in the upper back killed him.

"Curious as it may seem, you can reach four different verdicts, depending on what *you decide* as to Georgia Welborn's state of mind at the time of the shooting.

"Let us consider them in order, but please keep in mind

that the order in which I relate them has no relationship whatsoever to my opinion as to which verdict is right or desirable. . . .''

The judge then proceeded to repeat the theories upon which defendant could be acquitted, i.e., homicide by an unconscious or unvolitional act, homicide excusable by ''accident or misfortune in a state of intense emotion, eliminating reason and judgment, engendered by a sudden provocation so sufficient that it would excuse a normal person in killing another,'' and homicide by nonnegligent accident. Next explained was the possibility of a finding of second degree murder based upon the facts before the jury. This was followed by the same explanation permitting a verdict of voluntary manslaughter and lastly the circumstances under which the jury could find defendant guilty of involuntary manslaughter.

■ Defendant's first objection to the instruction given is that it did not repeat everything that the judge had already told the jury about the burden of proof, the degrees of proof and of proximate cause. It is contended the instruction given by inclusion of the phrase ''if you find'' seemed to tell the jury that there was some obligation on the part of the defense to establish innocence. Neither from that phrase nor from anything else in the instruction given was there anything from which such an inference could be drawn. The judge, as stated, had clearly and unequivocally instructed the jury that the prosecution had the burden of proof, that defendant was presumed innocent and there was not the slightest suggestion in anything the court stated in the special instruction deviating therefrom.

■ It is next contended that the court's special instruction in the portion thereof relating to voluntary manslaughter was ''woefully incomplete.'' The judge stated:

''Third, even though you find that Georgia Welborn shot at her husband intentionally, or indeed intended to kill him, you can find her guilty of voluntary manslaughter (instead of second degree murder) if you find that she was acting under such considerable provocation and in such state of mind that she was acting in a condition of intense, violent terror, rage, or other emotion that caused her to act rashly and without reflection, and from this emotion rather than judgment or thought.''

The judge was not purporting to repeat a comprehensive definition of voluntary manslaughter. He was effectually distinguishing second degree murder from voluntary manslaughter by pointing out that even though defendant had

intentionally shot *at* him intending to kill him she could never-theless be found guilty of the lesser offense of voluntary manslaughter if the conditions thereafter stated (as quoted above) existed. This was a correct statement. It benefited rather than harmed defendant.

The judge's clarification of instructions previously given was commendable and we find nothing therein which consti-tuted error.

*Re The Contention It Was Error for the Judge to Permit the Instructions to Be Taken by the Jury Into the Jury Room.*

▮ Penal Code section 1137 states that instructions may be taken into the jury room. Contending that it was error for the judge to permit this in the case at bench because some of the instructions contained deletions and additions by the judge, and because certain of the instructions indicated which side had offered them (or the fact that some were "Court" instructions), defendant cites *People* v. *Lyons,* 47 Cal.2d 311, 322-323 [303 P.2d 329]. The case has no application. The instruction there condemned was a formula instruction added by the judge indicating his belief in the guilt of the accused. There was nothing of that nature here. We have examined carefully the markings upon the instructions in the record. None of them was prejudicial to defendant. If anything, they made changes favorable to her position. She was not harmed.

*Re The Contention That It Was Error for the Judge to Comment on Evidence After the Jury, During Delibera-tions, Had Returned for Further Instruction.*

After the jury had commenced its deliberations, it asked to be and was returned to the courtroom. The foreman's first questions related to the meaning of certain words in an instruc-tion.

Their meaning was explained and no objection is or could be made that anything stated by the judge in that regard was improper. A juror then asked, "Are we allowed to have anything read back to us that we heard from the witness stand?" The court answered that they were. The juror then stated: "There was some question of this bullet that rico-cheted, whether that was actually . . . the fatal bullet . . .," and he then asked if the jury could hear the testimony of the expert. The judge then explained that two witnesses had testified on that subject and that an exhibit was involved.[2]

---

[2]Following is the court's statement: "THE COURT: Well, the testi-mony in regard to that, that would take two witnesses, though, first it

The prosecuting attorney then advised the court that Dr. Kirk's testimony had been transcribed, and the judge, after paraphrasing a preliminary statement in the testimony, quoted the transcript excerpt which contained the material requested. A juror (Ghiglieri) then asked: "Has it been proven the same bullet was taken out of the deceased was part of the same bullet that is in the cabinet door? Have they concluded it's the same bullet?" The court answered: "Not conclusively, but there's been testimony indicating it may be." The following then occurred: "JUROR GHIGLIERI: May be, but not conclusive. JUROR MOSTOWSKI: Are we to conclude it is? THE COURT: It is one of the things you may be called upon to decide. It's not essential in certain of the counts that you decide that. In other possibilities of decision it would be essential."

The jury retired from the courtroom and was taken out to dinner. Immediately thereafter, the court, upon the request of appellant's counsel, recalled the jury and explained to them that since, during the incident just described, they may have thought he was usurping the jury's function he wanted again to instruct that the jury was the sole judge of the facts.[3]

▇ Defendant contends that the episode described was an improper application of the court's right to comment on the evidence. The objection is made that it was prejudicial, first, as a matter of timing, and secondly, that in the use of the words, "I guess" in referring to the testimony of Dr. Kirk, the judge was suggesting a disbelief in that expert's testimony. The latter contention is baseless. The judge merely uttered

would take that—well, they have the exhibit, don't they, the envelope? You have the envelope which states that the bullet that hit him, the bullet that hit him in the upper back is the one that killed him, and you have the envelope which contains that bullet. Then there was testimony by Dr. Kirk, I guess, describing the condition of the bullet and whether it would be likely that condition could be caused by going through flesh alone. That's the testimony, I guess that's all of that testimony."

[3]He said: "Ladies and gentlemen, I'm sorry to disturb your deliberations, but it occurred to me in thinking about our colloquy here earlier that perhaps I said something which might cause you to feel that I was usurping your function, and I want to caution you again that it's up to you to decide what the facts of the case are. You heard the evidence and you've heard the arguments and you have in your possession the instructions as to the various rules of law applicable, and the burden of proof and so forth, and it's up to you to decide what the facts are; and any opinion I might have, it's improper, of course, you don't know what opinion I have on any issue, and even if you did know it would be improper for you to consder it. You must decide what the facts are on any of the issues.

"That was all I had to say, I just got thinking some of you may have thought I was trying to tell you what the facts are."

a preliminary speculation of what he thought the witness had stated and followed this by reading his testimony. As to the first objection, it has been shown above that the judge may comment on the evidence. (Cal. Const., art. VI, § 19; Pen. Code, § 1127.) We, as a reviewing court, would hesitate to give interpretation to the constitutional and Penal Code provisions constituting carte blanche to a trial judge to interrupt a jury's deliberations with his own comments regarding the evidence, but we find nothing in the described incident which constitutes judicial impropriety even remotely.

### *Re The Contention That a Verdict Form on Assault With a Deadly Weapon Should Have Been Included as a . Necessarily Included Offense.*

The last contention which we need notice is that stated in the above caption. Penal Code section 1159 provides that a defendant may be found "guilty of any offense, the commission of which is necessarily included in that with which he is charged. . . ." We need not here determine the question whether assault with a deadly weapon was necessarily included within the "charge" of murder as that charge was here framed.[4] ▮▮ Whether it was or was not, obviously a verdict form should not have been given on assault with a deadly weapon without instructing the jury of the circumstances under which it could return such a verdict as distinguished from a verdict of second degree murder.[5] ▮▮ When a killing is done with malice aforethought in the perpetration of an assault with a deadly weapon it is second degree murder (as the jury here was instructed). (See *Jackson* v. *Superior*

---

[4]This court in *People* v. *Lewis,* 186 Cal.App.2d 585, 599-600 [9 Cal. Rptr. 263] (hearing by Supreme Court denied) held that the basis for determining the absence or existence of assault with a deadly weapon as a "necessarily included offense" within a charge of murder was the accusatory pleading and that since the means of the commission of the murder (in that case a hatchet) was not alleged in the information, assault with a deadly weapon was not a lesser included offense within the definition. Since the accusatory pleading in the case at bench does not plead the means by which the murder was committed the *Lewis* rule could be applied here. That rule, however, was based upon dictum in *People* v. *Marshall,* 48 Cal.2d 394 [309 P.2d 456], a case in which a jury trial had been waived and in which the holding of the Supreme Court was that the court in a robbery prosecution had *power* to consider (and hold defendant guilty of) the offense as a violation of Vehicle Code section 503 (taking an automobile without consent, etc.), the information having described the automobile as an item involved in the robbery. We do not base our holding upon the rule asserted in the *Lewis* case.

[5]The judge, of course, had instructed the jury on the lesser included offenses of voluntary manslaughter and involuntary manslaughter.

*Court* (1965) 62 Cal.2d 521, 526 [42 Cal.Rptr. 838, 399 P.2d 374].)　　The offense of assault with a deadly weapon is a nonfatal offense—an attempt coupled by a present ability —and includes such acts (to bring it within the possibilities here) as firing a gun without intent to hit. (See 1 Witkin, Cal. Crimes (1963) p. 250, and cases there cited.) For the judge to have instructed the jury under the facts of this case, therefore, that it could bring in a verdict of assault with a deadly weapon he would have had to explain to the jury that as a condition to such a verdict the jury must reach the conclusion that in firing the fatal bullet (whichever in order of firing that bullet may have been) one of the defenses absolving defendant from blame existed, but that in firing one or more of the nonfatal bullets defendant had been guilty of a deadly weapon assault.

That would have been a most unusual hypothesis. It was certainly not a theory of the defense which sought to convince the jury that defendant was not guilty of any offense, or at most of involuntary manslaughter. Therefore, it is quite understandable why the defense requested neither instruction nor a verdict form on assault with a deadly weapon.　　In any event it was the defendant's election to make. As stated in *People* v. *Bailey,* 142 Cal. 434, at page 436 [76 P. 49]: ''If he [the defendant] desires the jury to understand that they are not compelled to either find him guilty of the high crime charged or acquit him entirely he can ask the court to so inform them. On the other hand, if he thinks that the jury cannot and will not convict him of the crime charged, and must therefore acquit him, his argument to them on that theory is not embarrassed by an interference of the court in the shape of an instruction that they may find him guilty of some other and perhaps slightly lesser crime than the one charged.'' It was stated in *People* v. *Roth,* 228 Cal.App.2d 522, at page 529 [39 Cal.Rptr. 582]: ''An exception to this rule has been expressed in murder cases, where it has been held that the trial judge must instruct on lesser offenses, without request, if the evidence would support conviction of a lesser offense. [Citations.]'' We have examined the authorities cited as support for the ''exception'' and conclude that such exception has no application here. Principal among the cases cited is *People* v. *Wade,* 53 Cal.2d 322, where the court states at page 334 [1 Cal.Rptr. 683, 348 P.2d 116]: ''In determining what instructions a trial court is required to give without request, the rule is usually stated to be that the court

has a duty to give instructions on the general principles of law governing the case, even though not requested by the parties, but it need not instruct on specific points developed at the trial unless requested. [Citation.] . . .

"The rule seems undoubtedly designed to promote the ends of justice by providing some judicial safeguards for defendants from the possible vagaries of ineptness of counsel under the adversary system. Yet the trial court cannot be required to anticipate every possible theory that may fit the facts of the case before it and instruct the jury accordingly. The judge need not fill in every time a litigant or his counsel fails to discover an abstruse but possible theory of the facts."

■■ In the case before us no ineptness characterizes defense counsel's failure to request instruction on assault with a deadly weapon as a possible verdict. Eschewing hindsight, we think he wisely decided NOT to request the instruction. And we hold it was not the duty of the trial judge, undirected, to do so or to furnish the verdict form thereon.[6]

It may be noted incidentally that defendant did not object to the omission of an instruction or of a verdict form on assault at the trial. (See Witkin, Cal. Criminal Procedure (1963) pp. 542-543; *People* v. *Chapman,* 207 Cal.App.2d 557, 580 [24 Cal.Rptr. 568].)

Other points raised by defendant have insufficient merit to justify discussion.

The judgment is affirmed. The appeal from the order denying defendant's motion for new trial is dismissed.

Friedman, J., and White, J. pro tem.,* concurred.

A petition for a rehearing was denied July 14, 1966, and appellant's petition for a hearing by the Supreme Court was denied August 31, 1966.

---

[6]The judge did furnish the jury with the definition of assault with a deadly weapon, this because he instructed that a homicide committed with malice aforethought while in the perpetration of assault with a deadly weapon constituted second degree murder. That instruction was properly given at the request of the prosecution. It was proper because under the evidence it was possible the jury could have found that the shots—all four of them—were fired without intent to hit or kill but under circumstances making her act second degree murder. It does not follow, as contended by appellant, that the giving of that definition required the judge to instruct on assault.

*Assigned by the Chairman of the Judicial Council.