[Crim. No. 4734. Fourth Dist., Div. Two. June 29, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
KENNETH ELLSWORTH McMANIS, Defendant and Appellant.

## COUNSEL

M. Stanford Tomlinson, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, William E. James, Assistant Attorney General, Mark L. Christiansen and Jay D. Coulter, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**GABBERT, J.**—By information, appellant Kenneth McManis was charged with the murder of Cecil Sewell. (Pen. Code, § 187.) After his plea of not guilty, a jury found him guilty of voluntary manslaughter, a lesser and necessarily included offense within the crime charged. Appellant's motions for new trial and for reduction of the verdict were denied; his application for probation was also denied. Appellant now appeals from the judgment.

Viewed most favorably in support of the jury's verdict, the record discloses appellant was the owner and operator of the Hawaiian Village Inn, a beer bar in Fontana. Shortly after 10 p.m. on the evening of January 2, 1970, one Horton entered the bar, ordered a beer, inquired if appellant was the manager, and told appellant the toilets in the back of the bar were overflowing. Appellant checked the toilets, but found nothing wrong. Appellant returned to the bar, and Horton began playing pool with one of three other men present.

Shortly thereafter, the decedent Sewell entered the bar. Horton testified he and Sewell had driven to the bar together. When appellant saw Sewell, he ordered Sewell to leave the bar, stating he would throw him out as he had done the first time. On an earlier occasion, appellant and Sewell had become involved in an argument over the way in which Sewell had parked his auto at the bar, and appellant had hit Sewell several times on the head with a sawed-off pool stick. On another occasion, appellant had purchased new booths for the bar; the covering of the booths had been slashed, and appellant believed Sewell had slashed them.

Appellant chased Sewell from the bar into the parking lot, swinging the same cue stick. Both Gary Matheson and Sam Grigson, two of the men in

the bar, testified appellant hit Sewell with the sawed-off stick. Sewell's broken wrist watch was later found outside the bar.

After appellant returned to the bar, Sewell walked to the outside corner of the building and picked up, as Matheson testified, a tire iron. Sewell then went to the back door of the bar, and began shouting at appellant. Howard Voss, the third patron of the bar, testified Sewell shouted: "Now, you son of a bitch, come out, I got something for you now." Grigson testified Sewell shouted: "All right, I'm ready for you." Appellant looked out from the bar, saw Sewell, took a four-inch Smith and Wesson revolver from behind the cash register, and returned to the parking lot.

The three patrons of the bar consistently testified someone yelled at Sewell to watch out, that appellant was carrying a pistol, and that Sewell never tried to strike appellant. In fact, all three men testified Sewell immediately returned to Horton's pick-up truck. Voss testified Sewell entered the passenger side of the truck and shut the door behind him.

Appellant, carrying the pistol, went to the passenger side of the vehicle. Both Voss and Grigson stated appellant appeared to reach inside the truck, and look on the floor and under the front seat for something; both testified they saw no struggle between appellant and Sewell. Matheson, on the other hand, testified the fatal shot was fired immediately after appellant reached the vehicle. In any case, shortly after appellant reached the vehicle, the pistol discharged. The bullet entered Sewell's head near the inside corner of his right eye, and exited behind the left ear. Sewell was immediately driven to Kaiser Hospital by Horton; he died there one week later.

In his defense, appellant testified he first chased Sewell from the bar with the cue stick, and Sewell then told him: "You are already dead and you do not know it." After he heard Sewell shouting from outside the bar, he saw Sewell carrying what he thought was a sawed-off bayonet he had seen in Sewell's truck once before. He pulled the door of the pick-up truck open as Sewell was in the process of entering the truck. At that point, he and Sewell began struggling over a tire iron; the tire iron was later found on the floor of the passenger's side of the truck. Appellant testified he tried to slap Sewell with the pistol, hit his arm, and the gun fired. Appellant stated, however, Sewell had not tried to hit him with the tire iron, and was not so trying at the time he attempted to slap him with the pistol. Appellant testified he did not pull the trigger on the pistol, but the gun fired when it hit Sewell's arm. John Davidson, a San Bernardino County Sheriff's criminalist, testified, however, the pistol could not be fired by striking it against something, and could be fired only by trigger-pull.

Appellant contends the evidence is insufficient to sustain the jury verdict of voluntary manslaughter. He also asserts the court erred in its instruction to the jury on involuntary manslaughter. He further contends the People wilfully suppressed discoverable evidence prior to trial, and he was thus denied the due process of law. Finally, he asserts the court erred, under our decision in *People* v. *Clay,* 18 Cal.App.3d 964 [96 Cal.Rptr. 213], in determining he was not eligible for probation.

As we shall discuss, we conclude the evidence was sufficient to sustain the jury's determination appellant was guilty of voluntary manslaughter. However, appellant is correct in his contention the court erred in its instruction on involuntary manslaughter; nonetheless, as we shall explain, the error was not prejudicial in that it could not have affected the jury's deliberations. Appellant is also correct in his assertion he was improperly denied discoverable evidence prior to trial; but neither was this error of sufficient magnitude to warrant reversal of the judgment. Finally, we reverse the judgment only insofar as it pertains to sentence, because the court was unconstitutionally restrained from a consideration of probation as a proper disposition in the case.

■ Appellant's contention the evidence was insufficient to support the jury's verdict of voluntary manslaughter is based on the characterization of the record as showing a lack of intent. We disagree.

Penal Code, section 192 defines voluntary manslaughter as "the unlawful killing of a human being, without malice . . . upon a sudden quarrel or heat of passion." ■ Voluntary manslaughter "is a wilful act, characterized by the presence of an intent to kill engendered by sufficient provocation and by the absence of premeditation, deliberation and (by presumption of law) malice aforethought." (*People* v. *Bridgehouse,* 47 Cal.2d 406, 413 [303 P.2d 1018]; *People* v. *Forbs,* 62 Cal.2d 847, 852 [44 Cal.Rptr. 753, 402 P.2d 825].) ■ The intent to kill required for a conviction of voluntary manslaughter is a state of mind, and is most often proved by circumstantial evidence. (*People* v. *Welborn,* 242 Cal.App.2d 668, 673 [51 Cal.Rptr. 644].) ■ In resolving appellant's contention, the test on appeal is whether there is substantial evidence to support the jury's conclusion. (*People* v. *Archerd,* 3 Cal.3d 615, 621 [91 Cal.Rptr. 397, 477 P.2d 421]; *People* v. *Redmond,* 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321].)

The evidence shows appellant had beaten the decedent with a cue stick previously, and believed that he had damaged the booths in the bar. Criminalist Davidson testified the pistol could not have fired as appellant

testified, but could have fired only by a trigger-pull. Voss testified the vehicle door was closed, but appellant opened it and reached into the truck. Both Voss and Grigson testified there was no struggle between appellant and decedent. Matheson testified the shot was fired immediately after appellant reached the vehicle. Even appellant himself testified the decedent did not attempt to strike him with the tire iron. Horton testified the vehicle's engine was running when the shot was fired; he also testified he neither saw nor heard any struggle, and the shot followed immediately after appellant opened the vehicle's door. Under these circumstances, the jury was justified in concluding appellant intended to fire the fatal shot, and in rejecting his testimony that the gun inadvertently fired during the struggle over the tire iron.

■ The jury was instructed the killing constituted involuntary manslaughter if it occurred without malice aforethought and without an intent to kill, during the commission of a misdemeanor inherently dangerous to human life. The jury was not instructed however, as to the meaning of "misdemeanor," other than it is a crime for which the punishment is other than death or imprisonment in the state prison. Appellant contends the court committed prejudicial error in failing to instruct what specific acts under the evidence presented could constitute a misdemeanor.

An instruction defining misdemeanor within the context of a misdemeanor-manslaughter instruction must be given *sua sponte*. (*People* v. *Failla*, 64 Cal.2d 560, 564 [51 Cal.Rptr. 103, 414 P.2d 39]; *People* v. *Lilliock*, 265 Cal.App.2d 419, 427-430 [71 Cal.Rptr. 434]; see *People* v. *Escarcega*, 273 Cal.App.2d 853, 859-860 [78 Cal.Rptr. 785].) Failure to do so may allow the trier of fact to engage in unguided speculation as to what conduct is sufficient to constitute a misdemeanor inherently dangerous to human life. Accordingly, the court here erred in failing to instruct which acts could constitute a misdemeanor within the meaning of the involuntary manslaughter instruction.

The question whether the error was prejudicial, however, is more difficult. In *People* v. *Huntington*, 8 Cal.App. 612, 616 [97 P. 760], the court stated: "If the killing was manslaughter, it is not important that it be classified. The statute [Pen. Code, § 193] does not distinguish [voluntary from involuntary] manslaughter in prescribing the punishment, but, on the contrary, makes the punishment not exceeding [15] years' imprisonment for manslaughter; and the question as to whether any case falls under the one head or the other does not appear to be material." Similarly, in *People* v. *Jackson*, 202 Cal.App.2d 179, 182 [20 Cal.Rptr. 592]; *People* v. *Freudenberg*, 121 Cal.App.2d 564, 594 [263 P.2d 875]; and *People* v. *Bones*, 35

Cal.App. 429, 433-434 [170 P. 166], the courts held it unnecessary for a verdict or judgment to specify whether a defendant was guilty of voluntary or involuntary manslaughter. As applied to the case at hand, the import of these cases appears to be that an error in the giving of an involuntary manslaughter instruction cannot be prejudicial where the defendant is found guilty of voluntary manslaughter, since no difference exists in the two classes of the crime.

Later cases have disagreed, however, and stressed the consequences of conviction of one or the other class of manslaughter. In *People* v. *Bross,* 240 Cal.App.2d 157 [49 Cal.Rptr. 402], the court, in reversing a judgment of voluntary manslaughter for a failure to give any involuntary manslaughter instructions, questioned: "Is it not reasonable to assume that the Adult Authority, in determining the punishment, would fix the term of imprisonment for a shorter term when the crime was involuntary manslaughter than it would if the conviction were for voluntary manslaughter?" (240 Cal.App.2d at p. 171.) And in *People* v. *Wynn,* 257 Cal.App.2d 664, 676 [65 Cal.Rptr. 210], and *People* v. *Alfreds,* 251 Cal.App.2d 666, 671 [59 Cal.Rptr. 647], the courts noted that a convicted defendant's eligibility for parole may depend on whether a loaded weapon was used with an intent to kill, or merely without due caution. (See also *People* v. *Southack,* 39 Cal.2d 578, 591 [248 P.2d 12].)[1] We think the *Bross-Wynn-Alfreds* line of cases persuasive. Accordingly, we conclude a defendant convicted of voluntary manslaughter may properly object to an error in the instructions on involuntary manslaughter. As we shall explain, however, we fail to see how appellant could have been prejudiced by the error.

Preliminarily, we note that *People* v. *Escarcega, supra,* 273 Cal.App.2d 853, held the failure to instruct on the meaning of misdemeanor within a voluntary manslaughter instruction was prejudicial per se. *Escarcega* involved singularly peculiar facts, however; the verdict form given the jury indicated a verdict of manslaughter without further specification, and the jury so found the defendant guilty. The jury there was not asked to differentiate in its verdict between voluntary and involuntary manslaughter. Accordingly, the verdict could not be read either as indicating a finding of an intentional killing, i.e. voluntary manslaughter, or a finding of a nonintentional killing, i.e. involuntary manslaughter. Thus the verdict gave

---

[1]Witkin also notes two other consequences of conviction of voluntary manslaughter, inapplicable to the facts here: an heir, devisee or legatee convicted of voluntary manslaughter of the decedent loses the right to succeed to him or take from him by will (Prob. Code, § 258), and a killer of an insured or joint tenant will be denied the estate or proceeds. (See *Abbey* v. *Lord,* 168 Cal.App.2d 499 [336 P.2d 226]; 1 Witkin, Cal. Crimes (1963) § 330, pp. 302-303.)

no indication whether the jury might have speculated as to the meaning of misdemeanor in reaching its undifferentiated verdict of manslaughter.

In *People* v. *Failla, supra,* 64 Cal.2d 560, however, the court reviewed a first degree burglary conviction and concluded it was reasonably probable a result more favorable to the defendant would have been reached, absent the error of the trial court in failing to define the meaning of "or any felony" within the context of a burglary instruction. In *Failla,* the failure to define felony may well have allowed the verdict to be based solely upon speculation. Similarly, in *People* v. *Chavez,* 37 Cal.2d 656, 668-669 [234 P.2d 632], the court weighed the failure of the trial court to define rape and murder as felonies in the context of a burglary instruction, but concluded no prejudice occurred. The significance of *Failla* and *Chavez* to the case at bench is this: prejudice must be demonstrated before the failure to define misdemeanor in the context of an involuntary manslaughter instruction will constitute reversible error. We find no prejudicial error here.

By its verdict of voluntary manslaughter, the jury could only have concluded appellant *intended* to kill Sewell. The finding of voluntary manslaughter can be interpreted no other way. Since a verdict of *involuntary* manslaughter based on proper instructions could have been based only on a finding that appellant did *not* intend to kill Sewell (Pen. Code, § 192; see *People* v. *Carmen,* 36 Cal.2d 768, 774 [228 P.2d 281]; *People* v. *McGee,* 31 Cal.2d 229, 238 [187 P.2d 706]), it is clear a proper involuntary manslaughter instruction could not have affected the jury's deliberations. Once the jury determined the crucial question of intent, an instruction defining misdemeanor would have been immaterial. And conversely, an instruction on the definition of misdemeanor could not have affected the decision on the question of intent. In short, the jury's verdict demonstrates it could not have reached its conclusion by speculating as to the meaning of misdemeanor. Accordingly, whether judged by the standard of *People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243], or that of *Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065], we conclude the court's error in failing to define misdemeanor in the context of the involuntary manslaughter instructions was not prejudicial, and does not require reversal.

█ Appellant contends the failure of the People to disclose tape-recorded statements of his and of the witnesses deprived him of the guarantee of due process of law.

█ The suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prose-

cution. (*Brady* v. *Maryland,* 373 U.S. 83, 87 [10 L.Ed.2d 215, 218, 83 S.Ct. 1194]; *In re Ferguson,* 5 Cal.3d 525 [96 Cal.Rptr. 594, 487 P.2d 1234].) ▮ The primary question here is whether the suppression involved requires reversal.

Late in the trial, on cross-examination of appellant, the prosecution disclosed the existence of a taped statement which appellant had made immediately after the shooting of Sewell. The court was informed the defense had no knowledge of the taped statement. An *in camera* discussion also revealed taped statements had been taken immediately after the shooting from the three witnesses at the bar—Matheson, Voss and Grigson—and from Horton. All of these witnesses had testified for the prosecution prior to the time the defense learned of the tape-recorded statements; the defense thus did not have whatever benefit the recordings may have provided for purposes of cross-examination. The prosecution revealed it became aware of the recorded statements a month or so before trial, and they had been in police files prior to that time.

The record shows the criminal discovery process in San Bernardino County is an informal one in which demand is made by letter upon the office of the district attorney for discovery, and the discoverable material is then released to the defense. The discovery demand letter was introduced into evidence, and demonstrates appellant requested "notification of the existence of any taped statements by any prospective witness [or the] defendant. . . ." Appellant also requested notification if any of the material sought later came into the possession of the prosecution. It is clear that under the informal discovery procedure here employed appellant was entitled to the recordings of his statements to the police. (See *Joe Z.* v. *Superior Court,* 3 Cal.3d 797, 802-805 [91 Cal.Rptr. 594, 478 P.2d 26]; *Powell* v. *Superior Court,* 48 Cal.2d 704 [312 P.2d 698]; *Vance* v. *Superior Court,* 51 Cal.2d 92, 93 [330 P.2d 773]; *Cash* v. *Superior Court,* 53 Cal.2d 72 [346 P.2d 407]; see also *Cicenia* v. *La Gay,* 357 U.S. 504, 511 [2 L.Ed.2d 1523, 1529, 78 S.Ct. 1297].) Appellant was also entitled to the recordings, made immediately after the shooting, of the statements of the witnesses. (*Funk* v. *Superior Court,* 52 Cal.2d 423 [340 P.2d 593].) The state ". . . has no interest in convicting on the testimony of witnesses who have not been as rigorously cross-examined and as thoroughly impeached as the evidence permits." (*People* v. *Riser,* 47 Cal.2d 566, 586 [305 P.2d 1].) Appellant thus requested and should have received the tape-recorded statements at least when the prosecution finally became aware of them before trial.

Neither *People* v. *Briggs,* 58 Cal.2d 385, 412 [24 Cal.Rptr. 417, 374

P.2d 257], nor *People* v. *Mort,* 214 Cal.App.2d 596, 600 [29 Cal.Rptr. 650] is contrary. Although those cases establish the prosecution is not under a continuing duty to disclose after informal discovery (see also *People* v. *Bazaure,* 235 Cal.App.2d 21 [44 Cal.Rptr. 831]; *People* v. *Seach,* 215 Cal.App.2d 779 [30 Cal.Rptr. 499]),[2] the demand letter here was sufficient to require such action. To reach a contrary conclusion would encourage the use of more complex formal discovery procedures instead of the informal practices here related, and would ". . . place substantial additional burdens on our busy trial courts." (*In re Ferguson, supra,* 5 Cal. 3d 525, 532.) We thus conclude the taped statements were properly requested, and should have been revealed to appellant before trial.

Under the letter requesting disclosure made by defense counsel the district attorney should have forthwith complied with the demand when he obtained knowledge of the tape recordings. In view, however, of our resolution of the issue, it is not necessary for us to consider the broader question of the failure of the police to reveal material evidence in their possession, whether such information is purposely, or negligently, withheld.[3]

---

[2]We note, however, that the United States Supreme Court has established for the federal system a continuing duty of disclosure. Federal Rules of Criminal Procedure rule 16 (g) states: "If, subsequent to compliance with an order issued pursuant to this rule, and prior to or during trial, a party discovers additional material previously requested or ordered which is subject to discovery or inspection under the rule, he shall promptly notify the other party or his attorney or the court of the existence of the additional material. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection of materials not previously disclosed, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may enter such other order as it deems just under the circumstances."

Similarly, the American Bar Association Project on Minimum Standards for Criminal Justice has suggested: "If, subsequent to compliance with these standards or orders pursuant thereto, a party discovers additional material or information which is subject to disclosure, he shall promptly notify the other party or his counsel of the existence of such additional material, and if the additional material or information is discovered during trial, the court shall also be notified." (Tentative Draft, Standards Relating to Discovery and Procedure Before Trial § 4.2, May 1969.)

[3]We note the problems that arise where there is non-disclosure in those situations where the prosecuting attorney did not have knowledge of the exculpatory evidence which was in the hands of the police, or where defendant's counsel could have uncovered the evidence by exercising due diligence himself. The federal cases on this subject are collected in 8 Moore's Federal Practice (2d ed.) paragraph 16.01 [1], pages 16-72 et seq.; and see *Barbee* v. *Warden, Maryland Penitentiary,* 331 F.2d 842; *People* v. *Renchie,* 201 Cal.App.2d 1, 5 [19 Cal.Rptr. 734]; *Evans* v. *Kropp,* 254 F.Supp. 218; also Louisell and Wally, Modern California Discovery (2d ed.) pages 832-866; and 3 DeMeo, California Deposition and Discovery Practice, section 16.04 (3), pages 16-130 et seq.; Tentative Draft, Standards Relating to Discovery and Procedure Before Trial, American Bar Association Project on Minimum Standards for Criminal Justice, May 1969, section 2.2, page 78 et seq.; compare, Federal Rules of Criminal Procedure, rule 16(a).

We nonetheless conclude under the circumstances here present appellant was not deprived of a fair trial. Either under the test of *People* v. *Watson, supra,* 46 Cal.2d 818, 836, or of *Chapman* v. *California, supra,* 386 U.S. 18, the error was harmless. The tape recordings were played before the jury; the jury was thus free to evaluate the statements of the witnesses and appellant in contrast with their previous testimony. Similarly, defense counsel was free to stress any differences or conflicts in the statements in his closing argument. The court permitted appellant to recall any witnesses whose prior statements had been recorded, for further examination; appellant did in fact recall Matheson under the court's ruling. A comparison of the statements and the testimony at trial reveals no serious inconsistencies, but only those minor discrepancies inherent in the renarration of any observations; the trial court reached the same conclusion in ruling on appellant's repeated motions for a mistrial because of the late-disclosed recordings. Finally, we do not view the evidence related above as close; taken as a whole, the record is markedly in support of the jury's determination. The trial judge was commendably fair in permitting the recall of witnesses in order to cure the prosecution's failure to disclose; we agree with her conclusion appellant was not prejudiced thereby.

▌ Appellant's final contention is meritorious. In *People* v. *Clay, supra,* 18 Cal.App.3d 964, we held unconstitutional the unnumbered sixth paragraph of Penal Code, section 1203, which requires the concurrence of the district attorney before probation may be granted in certain cases. The case at bench is controlled by *Clay.*

At sentencing, appellant requested a referral to a diagnostic facility of the Department of Corrections (Pen. Code, § 1203.03) prior to a decision as to probation. However, the prosecution explicitly stated the office of the district attorney would not concur in a grant of probation. The court, equally explicitly, stated that without the provisions of the sixth unnumbered paragraph of Penal Code, section 1203, the request for a referral would be granted, and that the court would, with an open mind, consider an application for probation in light of the report from the Department of Corrections. Viewing the referral as meaningless in view of the district attorney's refusal to concur in a grant of probation, however, the court sentenced appellant to state prison for the term prescribed by law.[4] The record is thus clear under *Clay,* that the court was unconstitutionally foreclosed from a consideration of probation as an appropriate disposition of the case.

---

[4]The court did request a study and recommendation pursuant to section 1168 of the Penal Code.

The judgment is reversed as to sentence, and the case is remanded to the Superior Court of San Bernardino County for that court to exercise its independent judicial discretion as to the eligibility of appellant for probation. In all other respects, the judgment is affirmed.

Gardner, P. J., and Kerrigan, J., concurred.