[Crim. No. 1583. Fifth Dist. Oct. 8, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
ELMO GERMANY, JR., et al., Defendants and Appellants.

**COUNSEL**

Richard F. Ellers, under appointment by the Court of Appeal, for Defendants and Appellants.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, James T. McNally and Harriet Wiss Hirsch, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BROWN (G. A.), P. J.**—Elmo Germany, Jr., and Danny Robert Thomas were convicted by a jury of voluntary manslaughter, a lesser included offense within the charged crime of murder. (Pen. Code, §§ 187, 192, subd. 1.) On this appeal from the judgments they urge error regarding instructions on the element of intent in voluntary manslaughter and that self-defense was established as a matter of law. As to the appellant Thomas, who was represented by the City Attorney of Hanford, the court is faced with the additional question of whether *People* v. *Rhodes* (1974) 12 Cal.3d 180 [115 Cal.Rptr. 235, 524 P.2d 363], decided subsequent to the briefing herein, has any operative effect as to this appeal.

The evidence is somewhat in conflict as to the events immediately preceding the shooting of Keith McCarty, the victim. We resolve these conflicts in favor of the respondent and view the evidence in the light most favorable to it. (*People* v. *Crowe* (1973) 8 Cal.3d 815, 833-834 [106 Cal. Rptr. 369, 506 P.2d 193].)

On the evening of June 17, 1972, at the Kings County Fair, Keith McCarty was fatally wounded by three bullets from a gun held by appellant Thomas.

Thomas had arrived at the fair between 10 and 10:30 p.m. that evening, accompanied by appellant Germany and his sister, Lavonne. While near the photo booth, McCarty, the victim, approached Lavonne, whom he knew, and asked for one of the pictures she just had taken. While discussing the pictures, McCarty removed a tobacco pouch from his pocket, and Lavonne asked him where he had gotten it; McCarty responded that he had found it on the ground. Germany and McCarty then began arguing over the pouch, Germany claiming that it was the same pouch he had lost the night before at the fair and which had contained $15.

The argument between Germany and McCarty continued as they walked into the bathroom, where they were followed shortly by Thomas who became involved in the argument on behalf of Germany.

McCarty subsequently approached his friend, Sammy Aguirre, and whispered to him asking him to "tell this guy you gave me a bag." Aguirre did so, but the argument continued. Eventually, Germany told McCarty, "You just owe me $15," and walked away with Lavonne toward the south gate to leave the fair. Thomas continued to argue with McCarty, however, and someone caught up with Germany and Lavonne and told them Thomas was surrounded and that "Man, Keith [McCarty] is going to jump [Thomas]." Germany returned to the area where the argument was continuing and observed that a crowd had surrounded Thomas and McCarty. McCarty was then heard telling Thomas, "he was going to kill him," and Thomas replied, "Don't threaten me. You kill me or be killed." Several other threats were exchanged during the developing tension.

Germany testified that as the group started walking, he heard one of McCarty's companions go up to McCarty and tell him to "go to the car and get the shotgun." McCarty had a reputation for carrying a shotgun in his car. McCarty's companion denied making this statement, however, and, in any event, all the witnesses agreed that McCarty then started running toward the south exit of the fairgrounds where his car was parked. Germany, Thomas and Lavonne then proceeded in the same direction, and Germany caught up with McCarty and the argument continued. One witness testified that while Germany was chasing McCarty he had a gun in his hand.

During the course of the continuing argument, Germany pointed the gun at McCarty's chest. Someone in the crowd gathering around yelled to McCarty to "Get those Niggers," and McCarty said something to the effect

"Man, I am going to finish this thing tonight. Man, if I go to my car and get my shotgun . . . I am going to kill both of you." As McCarty started walking away, Thomas told Germany, "Give me the gun and I will show you what to do with it." Thomas then took the gun from Germany and then, according to several witnesses, ran up to McCarty. McCarty again started walking away, but Thomas pushed him back and said, "I am not playing, dammit." Thomas then fired one shot in the air. According to several witnesses McCarty then simply stood still, while other witnesses testified that he started toward Thomas. Thomas then shoved McCarty back and shot him. McCarty doubled over and then fell, and Thomas shot him twice more as he lay helpless. When the gun started clicking, Thomas and Germany took off running with Lavonne toward their car parked at the south gate. Lavonne then drove away and eventually let Thomas and Germany out on the highway, where they hitchhiked a ride to Fresno.

McCarty died about 3 a.m. on the morning of June 18, 1972, due to shock and hemorrhage due to a gunshot wound in the abdomen. On August 18, 1972, two months after McCarty's death, Germany and Thomas were arrested by a Fresno police officer in the City of Fresno.

Appellants' defense was that of self-defense, asserting that they felt threatened by McCarty, who purportedly was going to get his shotgun, and also by the other people around them who appeared to be siding with McCarty.

■ Appellants complain of the court's instructions on the issue of the intent necessary to establish the crime of voluntary manslaughter. CALJIC No. 2.02 ("Sufficiency of Circumstantial Evidence to Prove Specific Intent") was modified at appellants' request by striking out all references to "specific intent" and substituting therefor "criminal intent." Appellants also point out that CALJIC No. 3.30, concerning the misdemeanor of brandishing a weapon (Pen. Code, § 417) equated the term "criminal intent" with "general intent." And finally, appellants direct our attention to the fact that there was no instruction given on the concurrence of act and specific intent.

Appellants argue that, taken together, these instructions misled the jury "by creating the impression that voluntary manslaughter required only a general criminal intent."

Voluntary manslaughter is a specific intent crime (*People* v. *Gorshen* (1959) 51 Cal.2d 716, 732-733 [336 P.2d 492]) and the substitution of the words "criminal intent" for the words "specific intent" in CALJIC No. 2.02 (see Appendix 1) was error, as was the omission to give an instruction

on the necessity of concurrence of act and specific intent. (*People* v. *Turner* (1971) 22 Cal.App.3d 174, 184 [99 Cal.Rptr. 186].) However, in the light of all of the instructions, which must be read together, and the evidence at trial, we have concluded that these errors were harmless.

The jury was properly instructed that "[v]oluntary manslaughter is the *intentional* and unlawful killing of a human being without malice aforethought" (CALJIC No. 8.40; italics added) and that involuntary manslaughter "is the unlawful killing of a human being without malice aforethought and without an intent to kill" (CALJIC No. 8.45). Further, the jury was instructed on the crimes of first and second degree murder and was instructed on the heat of passion necessary "[t]o *reduce* an *intentional* felonious homicide from the offense of murder to manslaughter . . . ." (CALJIC No. 8.42; italics added.)

These instructions make it clear that voluntary manslaughter requires an intent to kill and that involuntary manslaughter is an unlawful killing without an intent to kill. Thus, the jury could not have been misled into believing that merely inadvertent conduct would suffice for voluntary manslaughter. Moreover, the evidence clearly showed that Thomas intentionally aimed and fired the gun at McCarty, and thus there was no question that the killing was intentional and that it occurred as the result of the joint operation of the requisite conduct and specific intent. Thus the failure to give such an instruction was harmless. (*People* v. *Turner, supra,* 22 Cal. App.3d 174, 184.)

The only real jury issue was whether appellants acted in self-defense. The jury resolved this issue against appellants. In returning a verdict of voluntary manslaughter, the jury returned the lowest possible degree of homicide which the evidence indicated, there being no evidence that would have supported an involuntary manslaughter verdict.

In addition, the court has, on its own motion, augmented the record with the transcript of counsel's summations and they make clear that both counsel equated "criminal intent" with "intent to kill," making no argument whatsoever that general intent is equated with "criminal intent" or that voluntary manslaughter requires only a general intent. Accordingly, in light of the totality of the record, the court's modification of the instruction was harmless error (see *People* v. *McManis* (1972) 26 Cal.App.3d 608, 614-616 [102 Cal.Rptr. 889]) and not prejudicial even should we apply the test laid down in *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].

Further, the instruction given on brandishing a weapon (see Appendix

2), which equated criminal intent with "general intent," was specifically limited to "the crime of brandishing a weapon." It is inconceivable that the specific intent required in manslaughter could have reasonably been confused with this instruction. (*People* v. *Hill* (1967) 67 Cal.2d 105, 118-119 [60 Cal.Rptr. 234, 429 P.2d 586], cert. den., 389 U.S. 1009 [19 L.Ed. 2d 607, 88 S.Ct. 572].)

Moreover, the record makes clear that the modification of CALJIC No. 2.02 (see Appendix 1) was at appellants' express request, and that CALJIC No. 3.31 (concurrence of act and specific intent) was deliberately withdrawn by appellants; the errors therefore were invited. (*People* v. *Phillips* (1966) 64 Cal.2d 574, 581, fn. 4 [51 Cal.Rptr. 225, 414 P.2d 353].)

Although the doctrine of invited error has its limits (*People* v. *Ruiz* (1970) 11 Cal.App.3d 852, 865 [90 Cal.Rptr. 110]), it appears that appellants' counsel had a deliberate tactical purpose in not wanting the issue of specific intent to kill hammered into the jurors' minds. Since the decision was a tactical one, the doctrine of invited error precludes appellants from asserting the error on appeal. (*People* v. *Graham* (1969) 71 Cal.2d 303, 318-320 [78 Cal.Rptr. 217, 455 P.2d 153].)

Appellant Germany contends the court erred in instructing the jury that an aider and abettor need only have knowledge of the criminal purpose of the perpetrator and criminal intent. In making this argument, Germany asserts that "It would be absurd to convict a man as an aider and abettor with a lower degree of proof [than] that [which] would be required to convict the principal."

█ Nevertheless, it has been uniformly held that an aider and abettor need only have knowledge of the criminal purpose of the perpetrator and criminal intent (*People* v. *Durham* (1969) 70 Cal.2d 171, 181 [74 Cal.Rptr. 262, 449 P.2d 198], cert. den., 395 U.S. 968 [23 L.Ed.2d 755, 89 S.Ct. 2116]; *People* v. *Drolet* (1973) 30 Cal.App.3d 207, 216 [105 Cal.Rptr. 824]; *People* v. *Vasquez* (1972) 29 Cal.App.3d 81, 86 [105 Cal.Rptr. 181]) and need not have the specific intent to commit the target crime. (*People* v. *Herrera* (1970) 6 Cal.App.3d 846, 852-853 [86 Cal.Rptr. 165].) There was no error.

█ While the appellants "concede that the jury was fully instructed on the law of self-defense and the defense of another," they assert that the jury must have ignored the instruction because self-defense and defense of another were established as a matter of law, relying on those witnesses who indicate that McCarty started toward Thomas after the warning shot was fired, and also on the assumption that McCarty was going to his car to get a shotgun.

Whether self-defense or defense of others was established is a question of fact for the jury. (*People* v. *Bobo* (1960) 184 Cal.App.2d 285, 289 [7 Cal.Rptr. 466].) Thus, although appellants had no duty to retreat under California law (*People* v. *Garcia* (1969) 275 Cal.App.2d 517, 522 [79 Cal.Rptr. 833]), the jury may well have concluded, based on conflicting evidence, that McCarty was leaving in fear of Germany's drawn gun, and that he did not attack or threaten Germany or Thomas in any way. Furthermore, the fact that Thomas emptied the gun at McCarty after he had fallen strongly indicates that the homicide was deliberate and malicious and was not motivated by any fear on the part of Thomas or Germany.

Accordingly, the jury's verdict is supported by substantial evidence (*People* v. *Reilly* (1970) 3 Cal.3d 421, 424-425 [90 Cal.Rptr. 417, 475 P.2d 649]) and should not be disturbed on appeal.

Appellant Thomas was represented by Lawrence W. Clawson, a part-time city attorney for the City of Hanford. In the recent case of *People* v. *Rhodes* (1974) 12 Cal.3d 180 [115 Cal.Rptr. 235, 524 P.2d 363], the Supreme Court held as a "judicially declared rule of criminal procedure" (p. 186) that Clawson could not represent a defendant in a criminal proceeding because it violated public policy. The *Rhodes* opinion did not deal with the question of whether the rule enunciated therein is to have prospective or retroactive application.

In determining whether to apply a rule of criminal procedure retroactively, courts must look to three principal factors: " '(1) the purpose of the new rule; (2) the extent of reliance upon the old rule; and (3) the effect retroactive application would have upon the administration of justice.' " (*In re Tahl* (1969) 1 Cal.3d 122, 134 [81 Cal.Rptr. 577, 460 P.2d 449], cert. den., 398 U.S. 911 [26 L.Ed.2d 72, 90 S.Ct. 1708]; see also *In re Yurko* (1974) 10 Cal.3d 857, 865 [112 Cal.Rptr. 513, 519 P.2d 561].)

In the instant case, the purpose of the new rule as enunciated in *Rhodes* is that as a matter of public policy city attorneys should not represent criminal defendants because the duties of a public prosecutor are "inherently incompatible with the obligations of a criminal defense counsel." (12 Cal.3d at p. 186.) In so holding, however, the court noted that "Our holding today should not be construed as adversely reflecting upon the quality of legal counsel provided by Mr. Clawson in the instant case. To the contrary, the record demonstrates that Mr. Clawson competently represented defendant throughout all phases of the trial." (12 Cal.3d at p. 183, fn. 4.) We accord like plaudits to Mr. Clawson's performance in the case at bench. Furthermore, courts and prosecutors, up until the *Rhodes* case, have been relying on the fact that representation of criminal defend-

ants by city attorneys was permissible since there were no statutes or rules on the subject. As the court in *Rhodes* noted, "Similarly, we suggest no criticism of Judge Rosson for appointing Mr. Clawson. There was no statutory or decisional law prohibiting such appointments and it was an established practice to appoint Hanford's city attorney to represent indigent criminal defendants." (12 Cal.3d at p. 183, fn. 4.)

An affidavit from Mr. Clawson declares that between September 16, 1965, and March 5, 1973, he acted as counsel for indigents upon 235 assignments. The court takes judicial notice that the practice has been widespread in the rural counties of California and that declaring the rule of procedure announced in *Rhodes* to have retroactive effect would obviously have substantial adverse effect on the "administration of justice" and would compel retrial of many cases, such as the present one which lasted almost two weeks.

Considerations quite similar to the above were recently presented to the Supreme Court in *Gordon* v. *Justice Court* (1974) 12 Cal.3d 323 [115 Cal.Rptr. 632, 525 P.2d 72], where the court held for the first time that nonlawyer justice court judges could not preside over criminal trials. Noting that there has been "widespread reliance upon the validity of the justice court system" and that there would be severe "administrative problems," the court ordered that the decision is not to be applied retroactively. (12 Cal.3d at p. 334, fn. 13.)

We believe these comments are equally applicable to the instant case and therefore hold that the decision in *People* v. *Rhodes, supra,* 12 Cal.3d 180, should apply only to those cases in which trial commences after the decision in *People* v. *Rhodes* becomes final. (Cal. Rules of Court, rule 24(a).)

The judgments are affirmed.

Gargano, J., and Stone, J.,* concurred.

Appellants' petition for a hearing by the Supreme Court was denied December 5, 1974.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.