Filed 2/25/21  P. v. Arce CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D076543 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN393456) |
| JOSHUA VALENTINE ARCE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Harry M. Elias, Judge.  Affirmed.

Shay Dinata-Hanson, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos and Teresa Torreblanca, Deputy Attorneys General, for Plaintiff and Respondent.

After he spent months sending threatening social media messages, 18-year-old defendant Joshua Arce punched 17-year-old Jason G. in the face,

causing Jason to fall, have a seizure, and sustain a concussion. Arce maintained he had acted in self-defense. The jury found him guilty of aggravated assault (Pen. Code, § 245, subd. (a)(4)),[1] with a great bodily injury enhancement (§ 12022.7, subd. (a)); and battery causing serious bodily injury (§ 243, subd. (d)), with a serious felony allegation (§ 1192.7, subd. (c)(8)). Arce moved for a new trial on the basis that the jury's finding that he did not act in self-defense was contrary to the evidence. The trial court denied the motion and placed Arce on three years' formal probation.

On appeal, Arce contends insufficient evidence supports the jury's finding that he did not act in self-defense. He also contends the trial court erred by denying his new trial motion. We conclude these contentions lack merit, and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND[2]
### The Prosecution Case

*Background*

Arce and his eventual victim, Jason, went to the same high school until Arce transferred schools after his junior year. They never had classes or hung out together, but Jason had "a negative impression" of Arce because "[p]eople just saw him" as "kind of . . . rude."

One of Jason's best friends and classmates, Vincent, dated a fellow classmate, Wendy, for most of their junior year. After Vincent broke up with Wendy, they exchanged unkind comments on social media.

---

1       Undesignated statutory references are to the Penal Code.

2       Consistent with the applicable substantial evidence standard of review, we summarize the facts in the light most favorable to the judgment. (*People v. Lee* (2011) 51 Cal.4th 620, 625.) Notably, Arce did not adhere to this standard in his briefing.

After Vincent and Wendy broke up, it appears Arce began dating her.[3] When Vincent later posted a picture of his new girlfriend on the Snapchat social media platform, Arce posted a comment calling her "ugly or unattractive." Vincent responded by saying his new girlfriend was "better than what you can get," and referring to Wendy as his "sloppy seconds." Arce then started sending Vincent threatening messages indicating he wanted to fight.

At some point, Arce messaged Vincent that he was going to fight him at Jason's apartment complex. Arce also wrote that he was going to fight Jason after he got done with Vincent. Jason and Vincent waited at the apartment complex for Arce to arrive, but after about an hour and a half, Vincent got bored and left. About 30 minutes after that, Arce and one of his friends arrived at the complex. When Jason asked Arce why he was "making a big deal about this," Arce simply shrugged, nodded, and drove away. As Arce and his friend left, Arce told Jason through the car window, "After I'm done with Vincent, I'm going to go after you."

Later that day, Arce began sending Jason threatening messages on Snapchat communicating his desire to fight. Arce sent Jason threatening messages throughout the summer and into the fall of their senior year. Jason estimated Arce sent him 50 to 100 messages in total.

In the week leading up to the assault, Arce sent Jason several threatening messages. In one exchange, Arce wrote, "[Y]ou laughing now but when I see you it's wraps[.] I don't want your respect, I want you to stop talking shit online and say it to me in person . . . ." Jason responded, "I

---

[3]     Wendy denied at trial that she and Arce were ever in a romantic relationship, but their mutual friend, J.M., testified he "believe[d]" they were dating. Arce did not testify at trial.

already did and I'm not gonna waste my time on dumb shit anymore." Arce replied, "I feel it you're scared. I could've dropped you right there [in your apartment complex]. I regret not doing it." Jason responded, "WTF [meaning "what the fuck"], I'm not scared." Arce then "spamm[ed]" Jason with the following string of messages:

> "Then run it bruh [meaning "come on, like fight"]

> "That's what a bitch would say

> "You ain't about that action [laughing emoji]

> "You just talk about it

> "I wasn't gonna beat you up in your own apartment complex [laughing emoji] that's embarrassing

> "Plus my main problem was with [Vincent] but now you've been talking shit [a]bout me but won't say it to my face

> "Now we got problems bruh

> "And I know you're scared."

Jason responded with slang to the effect that Arce should "do[ ] whatever he has to do. I'm not going to make time for him. . . ."

Arce continued the thread by warning Jason, "you better have 'friends' because after [I'm] done whooping your ass [they're] next." Jason responded with a string of crying emojis, and the statement, "You straight lame get off my dms ["direct messages"] already."

In another exchange, Arce again referred to the incident in Jason's apartment complex, stating:

> "[I'm] not the same person you saw in that parking lot [crying emoji] imma show you [no] mercy in person and [I] would talk shit to you in person but your bitch ass keeps avoiding me [skull emoji]

> "Lmao, oh you brave now? You talkin over text and shit but wont run a fade [meaning "fight]  [¶] . . . [¶]

4

"I've fought stronger people than you . . . ."

Another time, when Jason posted a picture on Snapchat of a friend at a fast food restaurant, Arce commented, "I was just there. You lucky you didn't run into me. I would have ruined your night."

At some point, Jason messaged Arce, "Look, just stop messaging me. I'm not going to reply anymore." But Arce kept messaging Jason.

In one message, Arce wrote, "[Y]all act so brave on the phone but when I see you, [we're] gonna have some problems . . . . I know your scared ass be avoiding me . . . ."

In another message, Arce wrote:

> "Because you be wanting to fight on campus [laughing emoji] get that gay shit outta here. Bro [you're] built like [M]r. [B]ean, [I] know you're scared or you would have fought me by now[.] [¶] . . . [¶] You don't wanna see me, trust [devil emoji] imma fuck you up[.]"

Regarding this message, Jason denied at trial that he ever suggested to Arce that they fight on campus. As to the Mr. Bean reference, Jason explained at trial that he was about 5'8" or 5'9" tall, and weighed 125 or 130 pounds.

More generally, Jason testified he was, in fact, afraid of Arce and did not want to fight him, but he did not want to let Arce know that. Jason admitted he once agreed to meet Arce somewhere to fight, but "never showed up." Jason became so concerned about the threatening messages that he showed them to his mother the week before the assault. Jason's mother corroborated this at trial.

### *The Assault*

After school on Friday November 16, 2018, Jason and four of his friends rode their skateboards in the school parking lot while they waited for an evening basketball game. When they approached the school gym around 5:00 p.m., they saw Arce near an entrance.

5

Arce was no longer a student at the school, but Wendy claimed he was there to pick her up. She testified that school ended at 3:30 that afternoon, and Arce agreed to pick her up after her tutoring session ended at 5:00. She acknowledged it "was unique" for him to pick her up on a Friday. She further acknowledged that whereas Arce was waiting near the gym, her tutoring session was in a completely different building.

Jason and Arce walked toward each other and "met in the middle." Jason broke away from his friends to avoid giving Arce the impression they were approaching as a group to intimidate him. Jason's friends stood a few feet away from him. One of Arce's friends, J.M., stood within about a foot and a half of Arce, and some other friends were also in the area.

Jason and Arce stood face-to-face, within about two feet of each other. Jason asked Arce, "What's up," and they discussed the messages they had exchanged over social media. Jason may have used some "rude words." Jason told Arce to "[d]o something." Jason's friends encouraged the two to fight.

Jason stood with his hands in his pants pockets or down at his side. Arce shoved him about four times. Jason "would kind of hold his ground," "go back to where he was standing" before, and tell Arce not to touch him. Two witnesses testified Jason never touched Arce. During this exchange, Arce warned Vincent, "When I'm done with Jason, I'm coming for you."

Arce then told Jason, "I'm going to punch you." Jason still stood with his hands down at his side. Within a few seconds, Arce punched Jason in the face, knocking him to the ground. Jason hit his head on the pavement and had a seizure for about 45 seconds. Someone called 911.

Jason was transported by ambulance to the hospital, where he underwent a CAT scan and was diagnosed with a concussion. He also

6

sustained lacerations to the inside and outside of his left cheek, the former requiring two stitches. Jason was discharged later the same day.

Jason testified he had no memory from about lunchtime on the day of the assault until about 4:00 a.m. the next morning.[4]

Someone video-recorded a portion of the assault with a cellphone, and the footage was posted on social media and was widely disseminated among the student body. The video was admitted as a trial exhibit and is in the appellate record. The 37-second clip begins with Jason and Arce already standing face-to-face. Their verbal exchange is largely inaudible. The video does not depict any shoving or other significant movement until about the 28-second mark, when Arce suddenly punches Jason in the face. In one version of the video, which is not in the appellate record, a caption next to Arce's online username stated, "You run up on me, and I'll . . . hit you with a sleeper . . . ."

**Arce's Self-defense Case**

Arce did not testify at trial, but maintained he had acted in self-defense. To support this theme, he presented evidence about Jason's background, and elicited conflicting testimony about the circumstances of the assault.

Jason and Vincent testified that they and some of their other friends participated in an online group chat that had changed name several times before coming to be known as the "small cock gang" or "small cock group" (SCG). The defense insinuated the group was a street gang that claimed

---

[4]     The defense attempted to impeach Jason by establishing he told some of the details of the assault to doctors and police at the hospital. He also told a police officer at the hospital that he did not want to press charges, which the defense argued indicated Jason's consciousness of guilt.

7

their high school as its territory. The defense introduced a recording of a rap song Jason and his SCG friends had written and recorded that included some violent lyrics and in which they claimed to "run" their school. Jason acknowledged SCG was well-known at his school during his sophomore year, and that even some students at other schools had heard of them.

On the other hand, Jason and Vincent denied SCG was a gang. Jason testified the group essentially disbanded in their sophomore year after a school administrator told them to, but they continued to use the name in some contexts. Jason explained the rap song was "just lyrics" they wrote when trying to be funny and mimic real rap music. The song did not relate to Arce, and Jason never sent it to him or uploaded it to social media.

Jason's mother testified she was aware of SCG but was not concerned because "it's just a group." One of Wendy's school friends, Ryan, testified he had never heard of SCG. Arce's friend, J.M., testified he had heard of SCG, but thought of them as " 'gangsters in their own minds' . . . because they are really not gangsters." And one of the police officers who responded to the 911 call, and who was also a gang expert, testified he had never heard of SCG and did not see any indicia that Jason or his friends were gang members.

Jason also acknowledged he had been written up for several disciplinary issues during high school. In one instance, he cornered another student against a door in a manner the teacher believed was intimidating. In another instance, Jason broke a pencil that a classmate had borrowed from the teacher. And in yet another instance, Jason and some other students " 'came into class and began yelling and cussing at each other and wouldn't stop until separated.' " Jason testified Arce was not in any of the classes in which these incidents occurred.

Regarding the circumstances of the assault, Arce's friend, J.M., testified that Jason and his friends approached Arce, "surrounded him [in] a circle," said "slurs," and "harass[ed] him about his girlfriend" Wendy. Jason's friends also encouraged them to fight. Arce tried to step back from Jason, but Jason kept stepping forward. J.M. gave a statement to school administrators stating Arce "was pushing Jason off him for self-defense," and Jason was pushing back. However, J.M. acknowledged the video of the incident does not depict Jason ever touching Arce. J.M. also acknowledged he was looking away when Arce actually hit Jason.

Wendy's friend, Ryan, testified he saw Jason approach Arce within about two seconds of Arce exiting the school gym. Ryan testified Arce never backed up, and neither Arce nor Jason pushed the other before the assault. Ryan also testified Jason's friends were encouraging the two to fight, and Jason was "leaning in," "saying rude words," and "clench[ing] up his fist" "like he was about to swing at [Arce.]" However, Ryan acknowledged Jason's hands "stayed down to his side the whole time." And Ryan admitted he never said anything to the prosecutor during a pretrial interview about Jason making a fist.

The defense also suggested Jason's claim that he and his friends were going to the gym for a basketball game was "hogwash"—they were really searching for Arce. One of Arce's friends who played on the school's basketball team testified that the game on the day of the assault was not until 7:00 p.m. (two hours after the assault), and that students were supposed to enter the gym through a different entrance than the one near where the assault occurred. As to timing, however, J.M. testified he saw basketball players warming up inside the gym just before the assault. And

as to gym entrances, several students testified there were multiple gym entrances for basketball games.

## Charges and Jury Verdicts

Arce was charged with two offenses: (1) assault by means of force likely to cause great bodily injury (§ 245, subd. (a)(4)), with an enhancement allegation that he personally inflicted great bodily injury in the commission of the offense (§ 12022.7, subd. (a)); and (2) battery causing serious bodily injury (§ 243, subd. (d)), with an allegation that the offense constituted a "serious felony" because Arce personally inflicted great bodily injury in the commission of the offense (§ 1192.7, subd. (c)(8)).

The jury found Arce guilty on both counts, and found both special allegations to be true.

## New Trial Motion

About one week before the sentencing hearing, Arce moved for a new trial on the basis that the jury's finding that he did not act in self-defense was contrary to the evidence. The trial court denied the motion.

## Sentencing

The trial court placed Arce on three years' formal probation and ordered him to pay certain monetary assessments.

## DISCUSSION

### I. Substantial Evidence Supports the Jury's Finding That Arce Did Not Act in Self-defense

Arce raises only a straightforward challenge to the sufficiency of the evidence supporting the jury's finding that he did not act in self-defense. He does not contend the trial court committed evidentiary error. Nor does he contend the court committed instructional error. Indeed, in this vein, the record shows the trial court properly instructed the jury regarding pertinent self-defense principles: that the prosecution bore the burden of disproving

10

self-defense beyond a reasonable doubt (CALCRIM Nos. 875 [aggravated assault], 925 [battery], 3470 [self-defense, generally]); that Arce could not invoke self-defense if the jury found he provoked the confrontation to create an excuse to use force (CALCRIM No. 3472); and that the jury could consider Jason's background when determining the reasonableness of Arce's conduct (CALCRIM No. 3470).

Instead, Arce essentially asks us to second-guess the jury's quintessentially factual determination about whose version of events was more credible. That is not our role. Rather, it was the jury's role to weigh evidence and determine witness credibility, and the trial court properly instructed the jury on these principles. (See CALCRIM Nos. 226 ["Witnesses"], 302 ["Evaluating Conflicting Evidence"].) Our role is simply to determine whether substantial evidence supports the facts as found by the jury. As we will now explain, we conclude it does.

## A. Legal Principles

### 1. Standard of Review

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Powell* (2018) 5 Cal.5th 921, 944.) In doing so, we " 'presume[ ] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*Ibid*.)

" 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890 (*Covarrubias*).) " 'Conflicts and even testimony which is subject to justifiable

11

suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' " (*People v. Elliott* (2012) 53 Cal.4th 535, 585.)

" ' "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." [Citation.]' " (*People v. Solomon* (2010) 49 Cal.4th 792, 816; see *People v. Ghipriel* (2016) 1 Cal.App.5th 828, 832 [" 'It is of no consequence that the jury believing other evidence, or drawing different inferences, might have reached a contrary conclusion.' "].)

"Given this deferential standard of review, a 'defendant bears an enormous burden in claiming there is insufficient evidence' to support a conviction." (*People v. Wear* (2020) 44 Cal.App.5th 1007, 1020 (*Wear*).)

## 2. Self-defense

When self-defense is properly put at issue, the prosecution bears the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense. (See *People v. Adrian* (1982) 135 Cal.App.3d 335, 340-341; *People v. Lee* (2005) 131 Cal.App.4th 1413, 1429.)

" 'To justify an act of self-defense . . . , the defendant must have an honest and reasonable belief that bodily injury is about to be inflicted on him. [Citation.]' The threat of bodily injury must be imminent [citation], and ' . . . any right of self-defense is limited to the use of such force as is reasonable under the circumstances. [Citation.]' " (*People v. Minifie* (1996) 13 Cal.4th

1055, 1064-1065, italics omitted; see *People v. Brady* (2018) 22 Cal.App.5th 1008, 1014; CALCRIM No. 3470.)[5]

"A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force." (CALCRIM No. 3472 ["Right to Self-Defense: May Not Be Contrived"]; see *People v. Eulian* (2016) 247 Cal.App.4th 1324, 1332-1333 ["CALCRIM No. 3472 is . . . generally a correct statement of the law."].)

"Whether self-defense . . . was established is a question of fact for the jury." (*People v. Germany* (1974) 42 Cal.App.3d 414, 421; see *People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1179 ["[i]t was for the jury sitting as the trier of fact to decide whether appellant actually feared serious injury"].)

### B. Analysis

Arce has not met his " 'enormous burden' " to show insufficient evidence supports his conviction. (*Wear, supra*, 44 Cal.App.5th at p. 1020.) The properly instructed jury resolved conflicting testimony and found Arce did not act in self-defense. Substantial evidence supports this finding.

Substantial evidence supports the prosecutor's primary argument that Arce was not entitled to act in self-defense because he provoked the assault. Arce threatened Jason for months before the assault. Beginning in Jason's apartment complex, Arce warned, "After I'm done with Vincent, I'm going to go after you." Arce then sent Jason numerous messages threatening to

---

5    CALCRIM No. 3470 sets forth the following elements for self-defense: "1. The defendant reasonably believed that he was in imminent danger of suffering bodily injury or was in imminent danger of being touched unlawfully; [¶] 2. The defendant reasonably believed that the immediate use of force was necessary to defend against that danger; [¶] AND [¶] 3. The defendant used no more force than was reasonably necessary to defend against that danger."

"whoop[ ] [Jason's] ass" and "fuck [him] up," and warning, "when I see you it's wraps." Referencing Jason's "[M]r. [B]ean"-like stature, Arce bragged, "I've fought stronger people than you." Arce also mocked Jason repeatedly for avoiding him and not showing up for a scheduled fight. Then, Arce showed up at Jason's school, walked toward him, and eventually knocked him unconscious.

As the arbiter of credibility, the jury was free to reject Wendy's claim that Arce was only at the school to pick her up.[6] Instead, the jury could reasonably have found he was there to follow through on his months-long campaign of threats to assault Jason.

Substantial evidence also supports an alternative prosecution theory that Arce was not acting in self-defense because, consistent with the jury instructions, he did not "reasonably believe[ ] that he was in imminent danger of suffering bodily injury or . . . of being touched unlawfully." (CALCRIM No. 3470.) First, Arce wrote in at least four messages that he "knows" or "feel[s]" that Jason is "scared." Arce also mocked Jason for avoiding him and for failing to show up for a scheduled fight.

Second, although the jury heard extensive evidence about Jason's involvement with SCG and his history of school discipline, there was substantial evidence to support a finding that Arce was simply *unaware* of these aspects of Jason's background. (*People v. Bates* (2019) 35 Cal.App.5th 1, 9-10 ["Evidence that a victim had previously threatened or harmed others

---

6 Indeed, there were several reasons why the jury might have found Wendy not to be credible: J.M. contradicted her testimony that she was never in a romantic relationship with Arce; she acknowledged it "was unique" for Arce to pick her up from school on a Friday; and she further acknowledged Arce was waiting near the gym instead of near her tutor's classroom.

is relevant to a defendant's claim of self-defense *only if* the defendant knew of the victim's prior threatening conduct."].)[7] A gang expert and a schoolmate testified they had never heard of SCG; Jason testified he never uploaded the SCG rap song to social media or sent it to Arce; and Jason testified Arce was not in any of the classes in which Jason was disciplined.

Third, even if the jury found Arce was aware of Jason's background, substantial evidence would support finding that this awareness did not justify Arce's conduct. Jason and Vincent denied SCG was a gang; Jason's mother characterized it as "just a group"; the gang expert had never heard of it and never suspected Jason or his friends were gang members; and J.M. testified SCG members were "really not gangsters."

Fourth, regarding the circumstances of the assault, the jury was entitled to accept the evidence establishing that Jason and his friends broke apart when approaching Arce to avoid giving the impression they were trying to intimidate him. Additionally, several witnesses testified Jason never touched (let alone, pushed) Arce; rather, he just stood there with his hands in or near his pants pockets the whole time. The cellphone video of the assault substantiates this testimony.

On this evidence, the jury could reasonably have found that Arce did not honestly believe Jason posed an imminent threat of harmful or unlawful contact and, thus, Arce was not acting in self-defense.

Arce's challenges to the jury's findings essentially ask that we reweigh the evidence and reach different conclusions than the jury did. That is not

---

[7] In this regard, the trial court properly instructed the jury, "If you find that the defendant knew that Jason . . . had threatened or harmed others in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable." (See CALCRIM No. 3470.)

the role of an appellate court. (*Covarrubias*, *supra*, 1 Cal.5th at p. 890 [appellate courts " 'neither reweigh[ ] evidence nor reevaluate[ ] . . . witness[ ] credibility' "]; see *People v. Cortes* (1999) 71 Cal.App.4th 62, 81 [where an appellant "merely reargues the evidence in a way more appropriate for trial than for appeal," we are bound by the trier of fact's determination].) The fact that the evidence could also have supported contrary findings is of no moment—we examine only whether substantial evidence supports the judgment. (*Covarrubias*, at p. 890.) For the reasons explained above, we conclude it does.

## II. No Error in Denying New Trial Motion

Arce filed a cursory new trial motion challenging the evidentiary basis for the jury's factual finding that he did not act in self-defense. The trial court denied the motion with the following oral explanation: "In the Court's evaluation there was nothing unique about the testimony of the witnesses or the evidence presented that would . . . give me reason to find that the jury's assessment of the respective credibility is any different than I would necessarily find." Arce contends the court's explanation indicates it applied the wrong legal standard. We disagree.

"[S]ection 1181, subdivision (6) permits a defendant to move for a new trial on the ground that the verdict is contrary to the evidence." (*People v. Dickens* (2005) 130 Cal.App.4th 1245, 1251 (*Dickens*).) In deciding such a motion, the trial court "independently examines all the evidence to determine whether it is sufficient to prove each required element beyond a reasonable doubt *to the judge*, who sits, in effect, as a '13th juror.' " (*Porter v. Superior Court* (2009) 47 Cal.4th 125, 133.) "The trial court is not bound by the jury's determinations as to the credibility of witnesses or as to the weight or effect to be accorded to the evidence." (*Dickens*, at p. 1251.) Rather, it is "the trial

16

court's duty to give the defendant the benefit of its independent determination as to the probative value of the evidence." (*Id.* at p. 1252.)

"A trial court has broad discretion in ruling on a motion for a new trial, and there is a strong presumption that it properly exercised that discretion." (*People v. Davis* (1995) 10 Cal.4th 463, 524 (*Davis*); see *Dickens*, *supra*, 130 Cal.App.4th at p. 1252.)

We find no abuse of discretion in the trial court's denial of Arce's new trial motion. To support his contention that the trial court applied the wrong legal standard by deferring to the jury's factual findings, Arce focuses on the word "necessarily" in the second half of the trial court's rationale (that the jury's credibility determinations were not "any different than I would *necessarily* find" [italics added]). We are not persuaded. Rather, considering the court's entire ruling—including the first four words, "*In the Court's evaluation*" (italics added)—we are satisfied the court complied with its duty to independently evaluate the probative value of the evidence. (See *Davis*, *supra*, 10 Cal.4th at p. 524 ["Although defendant isolates statements in which the trial court refers to the jury's verdicts, it is clear from the record as a whole that it did not regard itself as bound by any of the jury's findings."].)

## DISPOSITION

The judgment is affirmed.


HALLER, J.

WE CONCUR:


HUFFMAN, Acting P. J.


AARON, J.