Filed 7/28/22  P. v. Lattin CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D079150 |
| Plaintiff and Respondent, | |
| v. | |
| STEPHEN JAMES LATTIN, | (Super. Ct. No. FVI17001301) |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, Tony Raphael, John M. Tomberlin, Eric M. Nakata, Judges. Affirmed in part; reversed in part.

Hamilton Law and Ryan A. Hamilton for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting, Warren J. Williams and Paige B. Hazard, Deputy Attorneys General, for Plaintiff and Respondent.

An information charged defendant Stephen James Lattin with 10 counts, including four counts of assault with a firearm (see Pen. Code, § 245,

subd. (a)(2)),[1] arising from an incident in April 2017. The jury convicted Lattin on the assault counts (and on two other counts), and made a true finding on each of the personal gun-use enhancements. (See § 12022.5, subd. (a).) The jury found him not guilty on four counts of making a criminal threat and rejected the allegations he committed the assault counts as hate crimes. The court sentenced Lattin to 16 years four months in prison.[2]

On appeal, Lattin contends his convictions for assault must be reversed. He argues he never should have been bound over to stand trial on these charges because the magistrate found the gun he used to commit the offenses was unloaded and thus there was no evidence of "present ability" to fire the weapon. Based on this same reasoning, he maintains the trial court erred in denying his pretrial motion to dismiss the assault charges (995 motion).

Lattin also asserts that, even if properly bound over, the trial court erred in denying his section 1118.1 motion for acquittal because new evidence at trial that the gun was loaded was "dubious" and this same failure of proof requires reversal of the assault convictions. Lattin further argues the trial

---

[1]    All further statutory references are to the Penal Code.

[2]    In sentencing Lattin, the trial court imposed the *upper* term of four years on count 1, plus a consecutive four years for the firearm enhancement. As to counts 2, 3, and 6, the trial court imposed consecutive one-year terms, plus consecutive one-year and four-month terms for the firearm enhancement. Finally, it imposed a consecutive eight-month term on counts 4 and 5. In light of the trial court's imposition of the upper term on count 1, we sought and received supplemental briefs from the parties regarding whether Assembly Bill No. 124 and Senate Bill No. 567, which became effective January 1, 2022 and which amended section 1170, retroactively apply to Lattin's case, and, if so, whether he is entitled to resentencing under this new law. However, in light of our reversal of the assault convictions, we find it unnecessary to decide this issue.

court's refusal to instruct on self-defense requires reversal of the assault charges and the personal gun-use enhancements. Finally, Lattin contends his conviction for felon in possession of a firearm must be reversed for lack of substantial evidence he possessed ammunition.

We conclude (1) Lattin was properly bound over for trial on the assault charges; (2) the trial court properly denied the 995 motion and the section 1118.1 motion for acquittal; and (3) the jury verdicts for assault and felon in possession of ammunition are supported by substantial evidence. But, we conclude the court erred in failing to instruct on self-defense and this error was prejudicial. Thus, we reverse Lattin's four assault convictions and the personal gun-use enhancements. We affirm counts 4 and 5.[3]

## ANALYTICAL FRAMEWORK

In his primary argument on appeal, Lattin maintains his convictions for assault with a firearm must be reversed because there is no credible evidence his shotgun was loaded and ready to fire at any point during the incident. We disagree. Lattin fails to credit differences in the evidence at each stage of the proceedings and fails to evaluate the state of that evidence against the controlling standard of proof.

As will be explained, testimony presented at the preliminary hearing and the trial differed regarding whether the shotgun was loaded and whether Lattin had the "present ability" to fire it. At the preliminary hearing, two victims testified Lattin pointed the shotgun at the four victims, threatened to kill them and "pumped" the weapon several times, but did not fire the shotgun. And a deputy sheriff, who took possession of the shotgun from a

---

[3]    Lattin has not challenged on appeal his conviction on count 4 for felon in possession of a firearm. (See § 29800, subd. (a)(1).)

fellow deputy, testified the shotgun was unloaded and there were three unspent shells in a sleeve attached to the butt of the gun.

By contrast, at trial one of the victims who had testified at the preliminary hearing stated he saw a brightly colored shell expelled from the shotgun as Lattin "pumped" it during the incident.[4]  Additionally, a deputy who served as the prosecutor's firearms expert and was present at the scene on the night of the incident, testified he saw three unspent shells inside a car driven to the crime scene by a friend of Lattin and this deputy was present when the shotgun used in the incident was found unloaded in the trunk of that same car.

Because different legal standards apply when evaluating the sufficiency of evidence at a preliminary hearing and on a 995 motion, an acquittal motion, and at trial, it is important to consider only the evidence that existed at each stage of the proceedings rather than conflating that evidence as Lattin does in this appeal.  Thus, on Lattin's claim no probable cause existed to bind him over for trial, and his related claim the trial court erred in denying his section 995 motion, we consider only the evidence presented at the preliminary hearing.  Similarly, on Lattin's claim the trial court erred in denying his acquittal motion, we consider only the evidence that was introduced at the close of the People's case-in-chief.  Finally, on Lattin's claim his assault convictions are not supported by substantial evidence, we rely on all admissible evidence presented at the trial.

---

[4]     The record suggests this new testimony was a surprise to both defense counsel and the prosecutor, and Lattin does not claim otherwise on appeal.

4

## FACTUAL AND PROCEDURAL OVERVIEW

### A. Assault Charges and the Preliminary Hearing

In May 2017, the People filed a five-count felony complaint against Lattin arising from an incident at a gas station located in Helendale, California. Counts 1 through 3 charged Lattin with assault with a firearm against victims M.B., J.R., and A.R., respectively. Count 4 charged him with felon in possession of a firearm; and count 5 with felon in possession of ammunition. In August 2017, the People amended the complaint to add count 6, an additional assault charge against A.D. Lattin's preliminary hearing took place on February 1, 2018.

### 1. A.D.

A.D. testified she, her teenage daughter J.R., teenage son A.R., and her friend M.B. (victims) were at a gas station on the night of April 5, 2017, and encountered Lattin, who A.D. knew from a previous incident. A.D. and M.B. had separately driven their cars to the station to buy gas and visit with station employees. While at the station, Lattin pulled up in his car, went inside the market, and came out "angry." He proceeded to the trunk of his car, pulled out a shotgun, and pumped it about five times. He then pointed the shotgun at each of the victims, while stating he was "from Peckerwood" and would "kill" them. Lattin drove off.

About 10 minutes later, Lattin returned to the station nearly striking A.D. and her daughter J.R. with his car. He parked, exited the car, and started throwing rocks at the victims while calling them "niggers." Lattin for a second time pulled his shotgun out of his car, pointed it at A.D. and J.R., pumped it about five times and stated he was going to "kill" them. A.D. could not "recall" whether anything came out of the shotgun when Lattin pumped it. Lattin also pointed the gun at M.B. and A.R.

5

Lattin then began fighting with M.B. and A.R. As they fought, two other cars arrived at the station. At some point, Lattin handed his shotgun to a female who had arrived in a black-colored car. The female, whom A.D. described as a family member of Lattin, then placed the gun in the trunk of the black car. Prior to taking possession of the weapon, the family members "yelled" and "begged" Lattin to "stop" threatening A.D. and her family with the shotgun.

### 2. Deputy Mora

Deputy Joseph Mora of the San Bernardino County Sheriff's Department testified he responded to the April 5 incident at the gas station. There he interviewed station employee T.W., who stated Lattin exited the market "upset," went to his car and pulled out a shotgun, then pointed it at a group of people while saying, "[D]o you want some?"

Deputy Mora also assisted in collecting evidence at the crime scene and obtained Lattin's shotgun from another deputy. He described the gun as "a pump-action shotgun that had a sleeve affixed to the butt of it which [contained] three shotgun shells black in color." On further questioning, Deputy Mora described the "sleeve" as being "like a cloth holster" attached to the "butt of the shotgun" but not part of its "mechanism"; and confirmed this "sleeve" contained three "unused" shotgun shells. The deputy noted the gun appeared operable but was unloaded when he took possession of it.

### 3. M.B.

M.B. testified Lattin pulled into the parking lot of the gas station driving "pretty fast," went inside the market, and "kicked" the door open when he exited. Lattin pulled out a gun from his car, pointed it at the victims and said he would "kill us mother fuckers if we have a problem." Lattin repeated his threat to " 'kill [us] fucking niggers' " as he made a

6

"pumping and racking motion" with the gun. M.B. described this motion as Lattin "sliding" his hand "up and down" the barrel. Lattin did not fire the weapon and left the gas station.

Within a few minutes, Lattin returned to the station and pulled out what appeared to M.B. to be a handgun.[5] Lattin pointed the handgun at M.B. and walked towards A.D. and her daughter. M.B. then backed up his car toward Lattin, jumped out of the car and began fighting with Lattin. At some point, Lattin grabbed the shotgun he had previously used to threaten them, pumped it, and, from a distance of about five feet, pointed the weapon at M.B. At that point, M.B. ran into a field next to the station and waited for deputies to arrive.

### 4. Magistrate's Findings

After the presentation of evidence, the defense moved to dismiss the assault charges based on the lack of evidence the shotgun was loaded. The prosecutor acknowledged Deputy Mora testified the gun was unloaded when he acquired it from another deputy, but argued it could have been loaded at some point during the April 5 incident. The prosecutor also argued that because of the proximity of the three shotgun shells in the sleeve attached to the gun, Lattin had the "present ability" to load and fire the shotgun.

In response, the magistrate stated the three shells "weren't in the gun. They weren't in the breach of the gun." He also noted Lattin "racked" the shotgun multiple times during the incident, and stated that, while not a gun expert, it appeared the gun was unloaded because otherwise it would have expelled a shell when Lattin pumped it. Although the magistrate stated he was unable to make a finding the shotgun was loaded, he questioned whether the three shells in the sleeve would "put it in the loaded category[.]"

---

[5]    No handgun was recovered by deputies at the crime scene.

In his oral pronouncement, the magistrate specifically bound Lattin over for possession of a firearm by a felon; and found the evidence supported the allegation this was a hate crime. He also stated, "I'm going to hold [Lattin] to answer for *whatever* crimes were established, including the ones I just outlined, and set this case for a hearing for arraignment on *whatever* the Information is that's filed" by the People. (Italics added.) The court's February 1, 2018 minute order from the preliminary hearing provides that the motion of the People to hold Lattin to answer in the Superior Court is "granted"; and that he is to answer to all six counts in the amended complaint *including* the assault charges.

### 5. The Information and Lattin's Section 995 Motion

The information the People filed after the preliminary hearing charged Lattin with 10 counts, including four counts of assault with a firearm, felon in possession of a firearm, felon in possession of ammunition, and four counts of making a criminal threat.

In May 2018, Lattin moved under section 995[6] to set aside the assault charges. He argued the assault charges should be set aside because the law required a firearm to be loaded for there to be an assault under section 245, subdivision (a)(2); the magistrate found the shotgun Lattin used to commit the offenses was unloaded; and the record shows the Magistrate (allegedly) had refused to bind him over on the assault charges.

The People opposed the section 995 motion, relying on Deputy Mora's preliminary hearing testimony that the shotgun used by Lattin "had a sleeve affixed to the butt of it" which contained three "unused" shells. Based on the close proximity of the shells to the shotgun, the People argued there was

---

[6] Section 995 requires an information to be set aside if, among other reasons, the defendant "ha[d] been indicted without reasonable or probable cause." (§ 995, subd. (a)(1)(B).)

sufficient evidence to support a finding Lattin had the "present ability" to fire the gun.

The court denied the 995 motion, noting that assault with a firearm could be committed even if the shotgun was unloaded, where, as here, the proximity of the shells to the gun was sufficient to establish the "present ability" element of assault.

## B. Evidence at Trial

### 1. Prosecution

#### a. J.H. and T.W.

J.H. was working at the market in the gas station on the night of the incident and was acquainted with many of the local residents including Lattin and the victims. At about 11:00 p.m., Lattin drove into the market parking lot with his two young children and entered the market. After making a purchase, Lattin "aggressive[ly]" "kicked" open the market door. T.W., another market employee, followed Lattin outside and heard Lattin and the victims arguing.

A few minutes later, while outside smoking cigarettes J.H. and T.W. saw Lattin come "speeding" towards the station, driving his car in an "aggressive[]" manner and nearly sideswiping A.D.'s and M.B.'s cars.

Lattin got out of his car and ran towards M.B., who was sitting in the driver's seat of his own car. M.B. reversed his car "real fast," "hit[ting]" Lattin and knocking him to the ground.

Lattin and M.B. began fighting and during the fight, J.H. heard others yell, "shotgun," "shotgun," and M.B. yell, "I'm not letting you [Lattin] get to that gun." At some point a black-colored car arrived at the station.

9

### b. J.R.

J.R., A.D.'s daughter, who was about 16 years old at the time of the incident, testified Lattin exited the market and started "going off," calling them " 'bitches,' " the "N word," and stating he "was from Peckerwood." J.R. saw Lattin go to the trunk of his car, pull out a shotgun and "cock[] it twice." As Lattin pointed the gun at each of the victims from a distance of about five feet, he yelled, " 'You want some[?]' " Lattin then drove away.

A few minutes later, Lattin returned to the station, nearly hitting J.R. and her mother as he drove past them. Shortly thereafter, other people known to Lattin arrived at the station in a black-colored car. They yelled, " 'No. Don't do it. Don't do it,' " imploring Lattin "not to shoot" as he again pointed the shotgun at one or more of the victims. J.R. later saw one of the occupants from the black car take the shotgun from the trunk of Lattin's car and place it into the trunk of the black car.

### c. M.B.

M.B., who identified himself, A.D., and her children as African American, testified he had never met Lattin before the April 5 incident.

According to M.B., Lattin came out of the market and said to M.B., " 'You nigger. I will kill you, nigger,' " and " 'Do you really want some? Do you want problems[?]' " While making these statements and claiming to be "of Peckerwood," Lattin pulled out a gun and pointed it at each of the victims.

Lattin drove away only to return about five minutes later. Concerned Lattin would retrieve his gun, M.B. backed up his car then jumped out and tackled Lattin to the ground. M.B. let Lattin up after Lattin said he "quit" and was "sorry" but Lattin immediately went for his gun. As M.B. ran away, he looked over his shoulder and saw Lattin again pointing a gun at him.

10

On cross-examination, defense counsel asked M.B. if he knew what happened when "a shotgun is racked [or] pumped," leading to the following colloquy:

"A [by M.B.]  Bullets pop out the shell.

"Q [by defense counsel]  Did you see anything pop out on April 5th of 2017?

"A  When he cocked it back, when he pulled it out of the car, something came out when he pointed it.

"Q  *What?  What came out?*

"A  The shell.

"Q  What color was it?

"A  Red.  Orange.

"Q  And you saw that fall out onto the ground somewhere?

"A  Un-hum, where his car was at."  (Italics added.)

### d.  A.D.

A.D. testified she and Lattin knew each other from a prior incident that had taken place in about January 2017, when Lattin had used a shotgun to threaten her son A.D.  On the night of April 5, Lattin pulled out a shotgun from the trunk of his car and pointed it at them while calling them "niggers," "monkeys," and "bitches," claiming he was "from Peckerwood," and threatening to "kill" them.  On his return to the station, Lattin pumped his shotgun about five times as he walked towards A.D. and her daughter, renewing his threats to "kill" them.  A.D. did not see "anything" expelled from the gun when he pumped it.  A.D. and her daughter ran inside the market, and A.D. called 911.

From inside the market, A.D. saw Lattin point the shotgun at M.B. and her son A.R.  Later, A.D. saw an occupant from a black-colored compact,

11

which had arrived at the station during the incident, take the shotgun from the trunk of Lattin's car and place it into the compact's trunk.

### e.  A.R.

A.R., who was 14 years old at the time of the April 5 incident, testified he recognized Lattin from an incident that had occurred in front of A.R.'s home a few months earlier.  In that prior incident, Lattin pointed a shotgun at A.R.

A.R. stated when Lattin cocked the shotgun and pointed it at them on April 5, the gun made a sound but nothing appeared to come out of the weapon.  A.R. added while Lattin and M.B. were fighting he took the key out of the ignition of Lattin's car and threw it into a field.  During that fight, A.R. "stomp[ed]" on Lattin while Lattin was on the ground.  After the fighting stopped, A.R. saw Lattin hand the shotgun to an occupant of a black-colored car in the parking lot.

### f.  Law Enforcement Witnesses

Deputy Malcom Page, who testified as the People's firearm expert, stated he was present when deputies opened the trunk of a black-colored Mazda and found a shotgun.  The firearm was a "pump-action shotgun" with a "fold-down stock," and appeared "functional."  Deputy Page also saw "three red shotgun live cartridges in the center console" of the Mazda.  These were the only shells found by deputies at the crime scene.

A gang expert for the People testified the term "Peckerwood" is "commonly used to describe white inmates or people associated with various white gangs, specifically the Aryan Brotherhood."  The expert opined someone claiming to be Peckerwood would typically dislike "any nationalities or races other than white."

12

## 2. Defense

Lattin, who testified in his own defense, stated he drove his Honda to the gas station on April 5 and was with his son and daughter. As Lattin opened his car door, he saw A.D. and M.B. standing near the gas pumps. One of them said to Lattin, " 'What the fuck are you doing here, cracker? We are going to fucking smoke you and your family,' you know, and they kind of went into a past experience." Lattin initially ignored the remarks, but became "agitated" by them once inside the market.

On returning to the Honda, Lattin saw his son "hanging" out the car window and heard A.D. and M.B. "still saying something." Lattin then saw M.B. "clutching his waist" while repeatedly saying, " 'I will get you and your family' " and " 'You ain't gonna do nothing. You ain't nothing but a punk bitch.' " Concerned M.B. was armed and believing he and his two children might be "kill[ed]," Lattin grabbed his shotgun from the trunk of the Honda, and, while sitting inside the car, pumped it about four or five times "to make sure it was cleared." Lattin stated he never pointed the weapon at any of the victims and also denied calling them the " 'N' word," saying he was "of Peckerwood," or threatening to "kill" them.

When asked if he had any "shotgun cartridges, red, orange, or any other color" with him during the April 5 incident, Lattin testified, "I'm almost 100 hundred percent certain there was nothing in there as far as shells or rounds. I'm almost positive," then added, "*I don't know for sure.*" (Italics added.) When asked why he retrieved an unloaded shotgun in that circumstance, Lattin testified, "To be honest, I don't know." He explained that he was "depressed" and "emotional" due to the recent loss of a son, and that he and his wife had argued earlier that night. Lattin believed that, if in fact M.B. had a gun, it might "be the easiest way to go out."

13

Lattin left the station because his children were in the Honda and his son was scared. After dropping them at home, Lattin drove back to the gas station to look for his wallet.

On his return, Lattin was surprised to see A.D. and M.B. still at the station. Lattin denied driving his Honda close to A.D. or her daughter. He also denied loading his shotgun before returning to the station.

After being pelted with rocks, Lattin stopped his Honda in the parking lot and got out of the car. Lattin heard a "screech[ing]" sound and, without warning, was struck "full-on" by M.B.'s car, knocking him to the ground. Once on the ground, Lattin was "pummeled" by M.B., who at some point was joined by A.R. Lattin suffered a bloody nose and lip, a contusion on his forehead, and a possible concussion, leaving him in a "fog."

Lattin managed to return to the Honda, but found the key missing from the ignition. As Lattin sat in the Honda, M.B. opened the driver-side door and continued his attack. Lattin then saw a black-colored Mazda being driven by a friend arrive at the station. Lattin's wife and another female were also in the Mazda.

During cross-examination, Lattin testified that he could not "recall" retrieving the shotgun from the Honda after he returned to the station. Nor could he "recall" how the gun ended up in the trunk of the Mazda.

Specifically, the prosecutor asked Lattin, "But you don't remember handing over the gun, handing over the ammunition to Thomas [the friend and driver of the Mazda], or anything from the black car?" to which Lattin answered, "I'm sure I didn't, but I don't remember. I can't say yes or no for certain. I can't." Lattin admitted that at least two of the shells found in the center console of the Mazda worked in his shotgun, and that he was "familiar" with those particular shells.

14

## DISCUSSION

### I. The Preliminary Hearing and the Assault Charges

Lattin contends that, because the magistrate at the preliminary hearing found the shotgun he used to commit these offenses was unloaded, he lacked the "present ability" to fire the gun, and thus, he should not have been required to answer to the assault charges in the information. (See §§ 241, 245, subd. (a)(2).)

### A. Guiding Principles

#### 1. Standard of Review

The purpose of a preliminary hearing is to establish "whether there exists probable cause to believe that the defendant has committed a felony." (§ 866, subd. (b); see § 872, subd. (a) [a defendant must be held to answer if "it appears from the examination that a public offense has been committed, and there is sufficient cause to believe the defendant guilty"].) " ' "Probable cause is shown if a [person] of ordinary caution or prudence would be led to believe and conscientiously entertain a strong suspicion of the guilt of the accused." ' " (*Rideout v. Superior Court* (1967) 67 Cal.2d 471, 474); see also *Perry v. Superior Court* (1962) 57 Cal.2d 276 (*Perry*) [same].) "Moreover, ' "[reasonable] and probable cause" may exist although there may be some room for doubt.' " (*Perry*, at p. 283.)

The evidentiary showing required at a preliminary hearing to bind over a defendant "is not substantial." (*People v. Superior Court* (*Lujan*) (1999) 73 Cal.App.4th 1123, 1127 (*Lujan*); see *Salazar v. Superior Court* (2000) 83 Cal.App.4th 840, 846 [the evidentiary standard at a preliminary hearing is "exceedingly low"].) " 'Every legitimate inference that may be drawn from the evidence must be drawn in favor of the information.' " (*Lujan*, at p. 1127.) We do not, however, attempt to reconcile evidentiary conflicts or judge the

15

credibility of witnesses.  (*People v. Barba* (2012) 211 Cal.App.4th 214, 227 (*Barba*).)

We directly review the evidence of the preliminary hearing to determine whether there was probable cause for Lattin to answer to the assault charges, and limit our review to evidence from the preliminary hearing transcript.  (See *People v. Gonzalez* (2017) 2 Cal.5th 1138, 1141 (*Gonzalez*) [an appellate court reviewing a section 995 order, by appeal or writ, reviews the determination of the preliminary hearing judge]; *Perry*, *supra*, 57 Cal.2d at p. 284; *Barba, supra*, 211 Cal.App.4th at pp. 227-228 [in reviewing a trial court's ruling on a section 995 motion, an appellate court directly reviews the determination of the magistrate].)

### 2.  **"Present Ability"**

Section 240 provides:  "An assault is an unlawful attempt, coupled with *a present ability*, to commit a violent injury on the person of another."  (Italics added.)  A conviction for assault with a deadly weapon requires proof of an attempt to inflict violent injury and the present ability to do so.  (*People v. Wolcott* (1983) 34 Cal.3d 92, 102; see § 245, subd. (a)(2) ["Any person who commits an assault upon the person of another with a firearm shall be punished by imprisonment in the state prison for two, three, or four years, or in a county jail for not less than six months and not exceeding one year, or by both a fine not exceeding ten thousand dollars ($10,000) and imprisonment."].)

" 'A long line of California decisions hold that an assault is not committed by a person[] merely pointing an (unloaded) gun in a threatening manner at another person.' "  *People v. Rodriguez* (1999) 20 Cal.4th 1, 11,

16

fn. 3 (*Rodriguez*);[7] *People v. Penunuri* (2018) 5 Cal.5th 126, 147 (*Penunuri*); see *People v. Orr* (1974) 43 Cal.App.3d 666, 672 (*Orr*) ["It is true that pointing an unloaded gun at another person with no effort or threat to use it as a bludgeon, is not an assault with a deadly weapon."]; but see *People v. Lochtefeld* (2000) 77 Cal.App.4th 533, 542, fn. 10 [calling the rule requiring a gun be loaded for assault with a firearm an "anachronism" and urging the Supreme Court to discard it].) "Similarly, threatening to shoot someone with a toy gun or candy pistol does not show the requisite present ability to commit a violent injury." (*People v. Ranson* (1974) 40 Cal.App.3d 317, 321 (*Ranson*).)

The Supreme Court in *People v. Chance* (2008) 44 Cal.4th 1164, 1167 (*Chance*) provided an overview of " 'the present ability' aspect of the crime" of assault with a firearm. *Chance* began its analysis by stating a key principle: "[T]he present ability element of assault . . . is satisfied when 'a defendant has attained the means and location to strike immediately.' " (*Id.* at pp. 1167-1168.) The court explained: "In this context . . . 'immediately' does not mean 'instantaneously.' It simply means that the defendant must have the ability to inflict injury on the present occasion. Numerous California cases establish that an assault may be committed even if the defendant is several steps away from actually inflicting injury, or if the victim is in a protected position so that injury would not be 'immediate,' in the strictest sense of that term." (*Id.* at p. 1168, fn. omitted.)

---

7    *Rodriguez* declined to address whether section 245, subdivision (a)(2) requires that a firearm be loaded, noting the "continuing viability of this rule is not questioned in this case, and the parties' briefs do not address it. Rather, we address the required quantum of circumstantial evidence necessary to demonstrate present ability to inflict injury and thus to sustain a conviction of assault with a firearm." (*Rodriguez, supra*, 20 Cal.4th at p. 11, fn. 3.)

17

"[W]hen a defendant equips and positions himself to carry out a battery, he has the 'present ability' required by section 240 if he is capable of inflicting injury on the given occasion, even if some steps remain to be taken, and even if the victim or the surrounding circumstances thwart the infliction of injury." (*Chance, supra*, 44 Cal.4th at p. 1172; see *id.* at p. 1176 [concluding the Court of Appeal erred in finding the defendant lacked the "present ability" to inflict injury on a police officer with a gun that had 15 rounds in the magazine but none in the firing chamber, merely because the defendant had pointed the gun in the wrong direction, away from the officer; and instead holding the defendant satisfied this element for an assault by equipping and positioning himself to carry out a battery].)

## B. Analysis

Initially, we reiterate that the scope of our review on this issue is limited to the evidence from the transcript of the preliminary hearing. (See *Gonzalez, supra*, 2 Cal.5th at p. 1141; *Perry, supra*, 57 Cal.2d at p. 284.) We thus reject any argument by Lattin that evidence from his trial, including the recovery of three shells from the center console of the Mazda following the incident, may be considered in determining whether there was probable cause for him to stand trial on the assault charges.

It is well settled that pointing an unloaded gun at another person with no effort or threat to use it as a bludgeon is not an assault with a deadly weapon. (*Penunuri, supra*, 5 Cal.5th at p. 147; *Orr, supra*, 43 Cal.App.3d at p. 672.) But, *Chance* teaches an assault may be committed "even if the defendant is several steps away from actually inflicting injury . . . so that injury would not be 'immediate,' in the strictest sense of that term." (*Chance, supra*, 44 Cal.4th at p. 1168.)

18

We find *Ranson*, cited with approval in *Chance*, instructive in the instant case. (See *Chance*, *supra*, 44 Cal.4th at pp. 976-978, citing *Ranson*, *supra*, 40 Cal.App.3d at p. 321.) In *Ranson*, the defendant aimed a rifle at a police car. After the police shot and disarmed him, they discovered there was no round in the chamber of the defendant's rifle because a cartridge in the magazine had jammed. (*Id.* at pp. 319-320.) *Ranson* nonetheless held the "present ability" element for an assault was satisfied under the "unique fact situation" there presented: "The rifle held by appellant was definitely loaded and operable; however, the top cartridge that was to be fired was at an angle that caused the gun to jam. There was evidence from which the trial court could infer that appellant knew how to take off and rapidly reinsert the clip. [¶] "Time is a continuum of which 'present' is a part. 'Present' can denote 'immediate' or a point near 'immediate.' . . . We are slightly more removed from 'immediate' in the instant case; however, we hold that the conduct of appellant is near enough to constitute 'present' ability for the purpose of an assault." (*Id.* at p. 321.)

Even though the defendant in *Ranson* would have had to remove the clip from the gun, dislodge a jammed cartridge, reinsert the clip, chamber a round, point the weapon and pull the trigger, the *Ranson* court concluded "present ability" existed. (*Ranson*, 40 Cal.App.3d at p. 321.)

Here, the evidence presented at the preliminary hearing showed Lattin was familiar with the shotgun, as he repeatedly racked and pumped the weapon on two different occasions while pointing it at the victims and threatening to "kill" them. The proximity of the shells to the shotgun—being in a sleeve *attached* to the butt of the gun—supports the inference that Lattin, within seconds, could have taken the additional step of loading them into the gun and firing it. (See *Chance*, *supra*, 44 Cal.4th at p. 1168 ["present

19

ability" "simply means that the defendant must have the ability to inflict injury on the *present occasion*" (italics added)].)

Moreover, given the proximity of the shells to the shotgun, it would appear Lattin in the instant case could have loaded his weapon and prepared it to fire in *less* time than the defendant in *Ranson*, where "present ability" was found to exist despite the fact the defendant there would have had to remove the magazine clip from the weapon, dislodge the jammed cartridge, and reinsert the clip prior to firing a round. (See *Ranson*, 40 Cal.App.3d at p. 321; see also *Chance, supra*, 44 Cal.4th at p. 1172 [a defendant has the "present ability" required by section 240 if he or she "is capable of inflicting injury on the given occasion, even if some steps remain to be taken"].)

In addition, A.D. testified she saw Lattin hand his shotgun to a female who had arrived at the gas station in a black-colored car. The female, whom A.D. described as a family member of Lattin, then placed the gun in the trunk of the black car. This evidence—and the reasonable inferences to be drawn from it—particularly when considered in light of the proximity of the unspent shells to the weapon and the family members' pleas of Lattin to "stop" threatening the victims with the gun, provide further support for a probable cause finding that Lattin's shotgun at some point during the incident was loaded and that the shells were removed from the weapon *after* Lattin handed it over to a family member. (See *Rodriguez, supra*, 20 Cal.4th at p. 12 ["[A] defendant's statements and behavior while making an armed threat against a victim may warrant a . . . finding the weapon was loaded."]; see *ibid* [whether or not a firearm is loaded is a question of fact].)

Drawing every legitimate inference from the evidence from the preliminary hearing and taking into account the "exceedingly low" evidentiary showing required at this hearing, we conclude there was

sufficient evidence to satisfy the "present ability" element of assault and the magistrate properly bound Lattin over for trial.[8]  And, because an appellate court's review of a trial court's ruling on a 995 motion is limited to evidence at the preliminary hearing, we also reject Lattin's claim the trial court erred in denying the 995 motion.  (*Barba*, *supra*, 211 Cal.App.4th at pp. 227-228.)

## II.  Trial

Lattin argues that at trial the People failed to present "any credible evidence" the shotgun was loaded.  He thus contends (1) the trial court erred when it denied his section 1118.1 acquittal motion and (2) there is insufficient evidence to support the jury's guilty verdicts.  Although Lattin acknowledges that at trial M.B. testified he saw an orange or red shell being expelled from the shotgun when Lattin pumped it, he maintains this testimony is "dubious" and not credible because it contradicted M.B.'s preliminary hearing testimony that he did not "*see*[] anything come out of the shotgun when it was pumped."  (Italics added.)  We disagree with these contentions.

First, we note the transcript from the preliminary hearing does not support Lattin's characterization of M.B.'s preliminary hearing testimony.  Instead, the transcript shows that, when defense counsel asked M.B. if anything came out of the gun when Lattin pumped it during their initial encounter at the station, M.B. replied:  "Yeah, he didn't *shoot*" (italics added); and when defense counsel next asked if, during their second encounter,

_____

[8]     In light of our decision that Lattin was properly bound over to answer to the assault charges, we reject his contention that his due process rights were violated.  (See *People v. Burnett* (1999) 71 Cal.App.4th 151, 167 ["[A] preliminary hearing transcript affording notice of the time, place and circumstances of charged offenses ' " 'is the touchstone of due process notice to a defendant.' " ' "].)

21

anything came out of the gun when Lattin made the same "pumping motion," M.B. responded: "I didn't *hear* nothing." (Italics added.)

Second, referring to M.B.'s trial testimony as "dubious" is simply a request by Lattin for this court to reweigh the evidence and the credibility of witnesses, a role exclusively reserved for the trier of fact. (See *People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*) [" 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' "]; see also CALCRIM No. 226 [instructing in part, "You alone, must judge the credibility or believability of the witnesses."].)

Third, in reviewing the denial of Lattin's section 1118.1 motion for acquittal, we apply the same standard as that for sufficiency of the evidence to support a conviction. (See *People v. Houston* (2012) 54 Cal.4th 1186, 1215 (*Houston*).) In so doing, we focus solely on the state of the evidence as it stood at the close of the People's case-in-chief. (*Ibid*.)

In a section 1118.1 motion, a trial court "does not ' "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." [Citation.] Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Lagunas* (1994) 8 Cal.4th 1030, 1038, fn. 6 (*Lagunas*); *Porter v. Superior Court* (2009) 47 Cal.4th 125, 132 (*Porter*).)

Here, in denying the section 1118.1 motion the trial court found sufficient evidence that the shotgun Lattin used to commit the offenses was loaded. The trial court relied on the testimony from multiple witnesses that Lattin pointed the shotgun at them and threatened to "kill" them; the testimony of M.B. that he saw a shell being expelled from the shotgun when Lattin pumped it; and the testimony of Deputy Page that the shotgun was

recovered in the trunk of the black Mazda, and three unspent shells were recovered in the center console of the same car.

Evaluating this evidence in the light most favorable to the prosecution (see *Houston, supra,* 54 Cal.4th at p. 1215), we conclude a rational trier of fact could have found beyond a reasonable doubt that the shotgun was loaded, the only element Lattin disputes on appeal for the crime of assault with a firearm (see *Porter, supra,* 47 Cal.4th at p. 132; *Lagunas, supra,* 8 Cal.4th at p. 1038, fn. 6).

Fourth, in considering a challenge to the sufficiency of the evidence to support the jury's guilty verdicts for assault, "we review the *entire* record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." "If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Albillar, supra,* 51 Cal.4th at p. 60, italics added.)

Here, as we already have noted in connection with the section 1118.1 acquittal motion, M.B. testified that a brightly colored shell "pop[ped] out" of the shotgun when Lattin pumped it. This evidence supports the inference the shotgun Lattin used in the April 5 incident was at some point loaded. (See *Albillar, supra,* 51 Cal.4th at p. 60; *People v. Barnwell* (2007) 41 Cal.4th 1038, 1052 ["Even when there is a significant amount of countervailing evidence, the testimony of a single witness that satisfies the [substantial evidence] standard is sufficient to uphold the finding."].)

Further support for the inference the shotgun was loaded is derived from the testimony that when others known to Lattin arrived at the station

23

in the black car, they implored him not to fire his weapon, yelling, " 'No. Don't do it.  Don't do it[,]' " and don't "shoot."  Thus, those who knew Lattin and were close to him—including, as it turns out, his *wife*—also believed the shotgun was loaded.

In addition, the fact deputies recovered three unspent shells in the Mazda's center console further supports the inference the shotgun was loaded.  Lattin could not remember handing the shells (and/or the shotgun) to his wife and/or a friend who arrived in the Mazda.  However, he admitted during his testimony that at least two of those shells looked "familiar" and could be fired from his gun.

This evidence, when considered in light of Lattin's threatening behavior of repeatedly pointing the shotgun at the victims on two separate occasions during the same incident,[9] while stating he was going to "kill" them, is more than sufficient to support the finding beyond a reasonable doubt that the shotgun was loaded and ready to fire.  (See § 245, subd. (a)(2); see also *Penunuri, supra*, 5 Cal.5th at p. 147 [observing the "fact that the gun was loaded may be inferred from circumstantial evidence, and we will uphold an assault conviction if the inference is reasonable"]; accord, *Rodriguez, supra*, 20 Cal.4th at p. 13 ["A defendant's own words and conduct in the course of an offense may support a rational fact finder's determination that he used a loaded weapon."]; *id.* at p. 12 [jury could reasonably have concluded

---

[9]      We note the trial court gave a unanimity instruction pursuant to CALCRIM No. 3500 in part as follows:  "The defendant is charged with assault with a firearm in counts 1, 2, 3, and 6. [¶] As to each of these . . . counts, the People have presented evidence of more than one act to prove that the defendant committed the offense charged in each count.  You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed."

24

a defendant had the present ability to harm the victim where he held a gun to the victim's chin and warned the victim if he did not keep his mouth shut, the defendant "could do to [the victim] what [he] did to [the others]" which included shooting and killing another victim]; *People v. Montgomery* (1911) 15 Cal.App. 315, 318 [the defendant's statement as he pointed a gun at the victim, " 'I have got you now,' " would be "meaningless" unless the gun was loaded].)

### III.  Self-Defense

Lattin next contends the court committed reversible error by refusing to instruct on self-defense.  We agree.

### A.  Additional Background

After the presentation of evidence and outside the presence of the jury, defense counsel requested an instruction on self-defense on the assault charges only.  The prosecutor opposed the request, arguing Lattin "himself said he didn't know what he was doing when asked specifically if he was trying to defend himself or anyone else."  The trial court agreed with the People, reasoning Lattin testified "something along the line, 'I just want to get this over.  I was not feeling well.  Depressed.'  At no time did he say, 'I was acting in self-defense,' or 'Tried to defend myself.'  So I don't believe there's evidence to give the self-defense instruction in this case."[10]

### B.  Guiding Principles

"Self-defense negates culpability for assaultive crimes . . . ." (*People v. Adrian* (1982) 135 Cal.App.3d 335, 340.)  "[T]he prosecution must prove beyond a reasonable doubt the absence of justification, herein self-defense, when the issue is properly presented . . . ." (*People v. Banks* (1976)

---

[10]    This appears to be the entirety of the reported discussion of the parties and the trial court regarding the appropriateness of a self-defense instruction in this case.

25

67 Cal.App.3d 379, 384.) CALCRIM No. 875, the instruction for assault with a deadly weapon, includes a bracketed section that, if applicable, provides: "5. The defendant did not act (in self-defense/[or] in defense of someone else)." The Bench Notes for CALCRIM No. 875 states a trial court should give CALCRIM No. 3470,[11] among other appropriate defense instructions, when there is sufficient evidence of self-defense or defense of another.

The obligation to instruct on self-defense arises when the defense is supported by "substantial evidence." (*People v. Oropeza* (2007) 151 Cal.App.4th 73, 78 (*Oropeza*).) Substantial evidence means evidence that, if believed, would be sufficient for a reasonable jury to find a reasonable doubt

---

[11] CALCRIM No. 3470 provides in part: "Self-defense is a defense to *<insert list of pertinent crimes charged>*. The defendant is not guilty of (that/those crime[s]) if (he/she) used force against the other person in lawful (self-defense/ [or] defense of another). The defendant acted in lawful (self-defense/ [or] defense of another) if: [¶] 1. The defendant reasonably believed that (he/she/ [or] someone else/ [or] *<insert name of third party>*) was in imminent danger of suffering bodily injury [or was in imminent danger of being touched unlawfully]; [¶] 2. The defendant reasonably believed that the immediate use of force was necessary to defend against that danger; [¶] AND [¶] 3. The defendant used no more force than was reasonably necessary to defend against that danger. [¶] Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was (imminent danger of bodily injury to (himself/herself/ [or] someone else)/ [or] an imminent danger that (he/she/ [or] someone else) would be touched unlawfully). Defendant's belief must have been reasonable and (he/she) must have acted because of that belief. The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the defendant did not act in lawful (self-defense/ [or] defense of another). When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed."

as to guilt.  (*People v. Salas* (2006) 37 Cal.4th 967, 982-983 (*Salas*); *Oropeza,* at p. 78 [substantial evidence is evidence that is sufficient to deserve consideration by the jury and from which it could conclude the particular facts underlying the instruction existed].)  However, a trial court "need not give instructions based solely on conjecture and speculation." (*People v. Young* (2005) 34 Cal.4th 1149, 1200.)

A defendant acts in self-defense when he or she actually and reasonably believes in the need to defend against imminent bodily injury or death.  (See *People v. Humphrey* (1996) 13 Cal.4th 1073, 1082 (*Humphrey*); see also CALCRIM No. 3470.)  The law of self-defense "recognizes that the objective component is not measured by an abstract standard of reasonableness but one based on the defendant's perception of imminent harm or death.  Because his state of mind is a critical issue, he may explain his actions in light of his knowledge concerning the victim.  [Citations.] Antecedent threats as well as the victim's reputation for violence, prior 'assaults, and other circumstances [are] relevant to interpreting the attacker's behavior.'  [Citations.]  While such considerations alone do not establish a right of self-defense [citation], they illuminate and reflect on the reasonableness of defendant's perception of both the imminence of danger and the need to resist with the degree of force applied.  [Citation.]  They may also justify the defendant 'in acting more quickly and taking harsher measures for [his] own protection in the event of assault, whether actual or threatened, than would a person who had not received such threats.' "  (*Humphrey*, at p. 1094 (conc. opn. of Brown, J.).)

We review alleged instructional errors de novo.  (*People v. Waidla* (2000) 22 Cal.4th 690, 733; *Oropeza, supra,* 151 Cal.App.4th at p. 78.)  Self-

defense is a question for the trier of fact. (See *People v. Germany* (1974) 42 Cal.App.3d 414, 421 (*Germany*).)

## C. Analysis

The trial court found the self-defense instruction was unwarranted because Lattin expressed no desire to defend himself or others (i.e., his two children) during the April 5 incident, but instead pulled out the shotgun and pointed it at the victims, including M.B. in particular, because Lattin was " '[d]epressed,' " " 'not feeling well,' " and just " 'want[ed] to get this over.' "

However, in refusing to instruct on self-defense, the trial court failed to consider substantial other evidence pertinent to this defense, including that Lattin and A.D. (and her family) did not like each other based on an incident between Lattin and A.D.'s son that had occurred a few months before the April 5 incident (see *Humphrey*, *supra*, 13 Cal.4th at p. 1094 (conc. opn. of Brown, J.) ["knowledge concerning the victim," "prior 'assaults, and other circumstances [are] relevant to interpreting the attacker's behavior' " in determining for self defense the reasonableness of the defendant's perception of imminent harm or death]); that after Lattin parked, one of the victims called him a "cracker," asked, "What the fuck are you doing here[?]" and threatened to "fucking smoke" him *and* his family, which ostensibly included his two young children who had accompanied him to the market; that Lattin saw M.B. "clutching" his waist, which Lattin interpreted to mean M.B. may be armed; and that because Lattin was concerned he and his two children might be "kill[ed]," Lattin retrieved his shotgun from the trunk of his car, racked it to make sure it was unloaded, and confronted M.B. and the others before driving off.

And, when Lattin returned to the station a few minutes later looking for his lost wallet, one of the victims allegedly threw rocks at his Honda.

28

When Lattin exited his car to investigate, M.B. used his car to strike Lattin "full-on," knocking him to the ground. M.B. then jumped out of his car and began "pummel[ing]" Lattin, who was disoriented and in a "fog." With Lattin on the ground, A.R. joined in the attack. It was during this second encounter that Lattin again pointed what he claimed was his unloaded shotgun at the victims.

From the foregoing, it is clear that there was significantly more evidence pertinent to self-defense than merely that Lattin was " 'depressed' " and " 'not feeling well.' " We independently conclude this additional evidence, if credited by the jury (see *Germany*, *supra*, 42 Cal.App.3d at p. 421), would be sufficient to support a finding that Lattin pointed the shotgun at the victims because he reasonably believed that he was in imminent danger of suffering, and ultimately did suffer, bodily injury; that the immediate use of force was necessary to defend himself and/or his two children; and that he used no more force than necessary in their defense. (See *Salas*, *supra*, 37 Cal.4th at pp. 982-983; *Humphrey*, *supra*, 13 Cal.4th at p. 1094 (conc. opn. of Brown, J.); *Oropeza*, *supra*, 151 Cal.App.4th at p. 78; CALCRIM No. 3470.)

Moreover, we conclude the court's failure to instruct on self-defense was not harmless error. Error in misdirecting a jury by failing to give an instruction, as in the instant case, is reviewed under the standard adopted in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). (*People v. Breverman* (1998) 19 Cal.4th 142, 175-176.)

By its verdict, the jury demonstrated its rejection of the prosecution's theory that Lattin criminally threatened the victims (counts 7-10); and that his conduct also constituted a hate crime. In addition, because self-defense, if applicable, is an element of assault with a deadly weapon (see CALCRIM No.

29

875, element No. 5), the failure to recognize this defense relieved the People of the burden to disprove it on the assault counts.

In light of the entire record, we conclude it is reasonably probable that Lattin could have obtained a more favorable result on the assault counts if the jury had been instructed on self-defense. (See *Watson, supra,* 46 Cal.2d at p. 836.) Accordingly, we reverse his convictions for assault with a firearm (see § 245, subd. (a)(2)) and the personal gun-use enhancements (see § 12022.5, subd. (a)(1)).

## IV. Felon in Possession of Ammunition

Lattin next contends the evidence was insufficient to support his conviction for felon in possession of ammunition because the three shells recovered by deputies at the crime scene were found in the center console of the black Mazda—a car driven by a friend—and not in Lattin's car or on his person.

## A. Guiding Principles

Section 30305, subdivision (a)(1) provides in part, "No person prohibited from owning or possessing a firearm . . . shall own, possess, or have under custody or control, any ammunition or reloaded ammunition."

(See CALCRIM No. 2591.)[12]  Possession may be either actual or constructive. (See *In re Daniel G.* (2004) 120 Cal.App.4th 824, 831.)  A defendant has actual possession when the prohibited item is in his or her "immediate possession or control."  (*People v. Pena* (1999) 74 Cal.App.4th 1078, 1083.)

By contrast, constructive possession exists when a defendant knowingly controls or maintains the right to control the prohibited item, "either directly or through another person."  (*People v. Sifuentes* (2011) 195 Cal.App.4th 1410, 1417.)  Although a defendant may share possession with other people, "mere proximity" or opportunity to access the contraband, "standing alone, is not sufficient evidence of possession."  (*Ibid.*)

We review Lattin's challenge to the sufficiency of the evidence in the light most favorable to the judgment to determine whether it discloses substantial evidence such that a reasonable fact-finder  could find him guilty beyond a reasonable doubt.  (See *Albillar*, *supra*, 51 Cal.4th at p. 60.) " 'Substantial evidence includes circumstantial evidence and any reasonable

---

[12]  The trial court in the instant case instructed the jury with CALCRIM No. 2591 in part as follows:  "The defendant is charged in Count 5 with unlawfully possessing ammunition, in violation of . . . section 30305(a). [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant owned, possessed, or had under his custody or control ammunition; [¶] 2. The defendant knew he owned, possessed, or had under his custody or control the ammunition; [¶] AND [¶] 3. The defendant had previously been convicted of a felony. [¶] Ammunition means a bullet, cartridge, magazine, clip, speed loader, autoloader, or projectile capable of being fired from a firearm with a deadly consequence.  Ammunition includes reloaded ammunition. [¶] Two or more people may possess something at the same time. [¶] A person does not have to actually hold or touch something to possess it.  It is enough if the person has control over it or the right to control it, either personally or through another person. [¶] The defendant and the People have stipulated . . . that the defendant was previously convicted of a felony."

31

inferences drawn from that evidence.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 57 (*Brooks*).)

## B. Analysis

As noted *ante*, M.B. testified that he saw a bright red or orange shell "pop out of" Lattin's shotgun when Lattin pumped the weapon. (See *Chance, supra*, 44 Cal.4th at p. 1168; *Ranson, supra,* 40 Cal.App.3d at p. 321; *People v. Simpson* (1933) 134 Cal.App. 646, 651-652.)

Notwithstanding this evidence, Lattin contends he never "possess[ed]" or "control[led]" the ammunition because deputies found the three shells in the center console of the Mazda. However, multiple witnesses observed one of the occupants of the Mazda—either Lattin's wife or his friend—take possession of Lattin's shotgun, either by removing it from the trunk of Lattin's Honda or by receiving it directly from him. The shotgun was then placed in the trunk of the Mazda, where it was recovered by deputies. This evidence supports an inference that, whoever took possession of the shotgun, also took possession of the three live shells. As noted, because Lattin was in a "fog" and possibly concussed, he could not remember whether he handed the ammunition (or his gun) to his wife or friend. However, Lattin never denied that the shotgun belonged to him. He also admitted two of the shells discovered by deputies in the Mazda looked "familiar."

We conclude this evidence amply supports the jury's finding that Lattin, a convicted felon, either actually or constructively "possessed" the ammunition. (See § 30305, subd. (a)(1); see also *Brooks*, *supra*, 3 Cal.5th at p. 57; *Albillar*, *supra*, 51 Cal.4th at p. 60.) We therefore affirm his conviction on count 5.

## DISPOSITION

We reverse Lattin's convictions on counts 1, 2, 3, and 6 for assault with a firearm and the personal gun-use enhancements. We affirm his conviction on count 4 for a felon in possession of a firearm and on count 5 for felon in possession of ammunition. Assuming there is a retrial on the assault counts, and depending on the outcome, the trial court may address the new requirements under section 1170 in imposing sentence. In all other respects we affirm the judgment.

HALLER, Acting P. J.

WE CONCUR:


AARON, J.


DATO, J.